**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1009**

H.H., a minor, by and through her mother and next friend,
H.F.; H.F.,

                    Plaintiffs – Appellees,

          v.

WANDA MOFFETT, individually and in her official capacity as
an employee of the Chesterfield County School Board; ANN
MINGUZZI, individually and in her official capacity as an
employee of the Chesterfield County School Board,

                    Defendants – Appellants,

          and

CHESTERFIELD COUNTY SCHOOL BOARD; MARCUS J. NEWSOME, in his
official capacity as Superintendent of Chesterfield County
Schools,

                    Defendants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.  Richard L. Williams, Senior
District Judge.  (3:07-cv-00223-RLW)

Argued:  December 4, 2008          Decided:  July 7, 2009

Before NIEMEYER, MICHAEL, and GREGORY, Circuit Judges.

Affirmed and remanded by unpublished opinion.  Judge Gregory
wrote the opinion, in which Judge Michael joined.  Judge
Niemeyer wrote a dissenting opinion.

**ARGUED:** Steven Latham Micas, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF CHESTERFIELD, Chesterfield, Virginia, for Appellants. William Henry Hurd, TROUTMAN SANDERS, L.L.P., Richmond, Virginia, for Appellees. **ON BRIEF:** Stylian P. Parthemos, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF CHESTERFIELD, Chesterfield, Virginia, for Appellants. Kevin W. Mottley, Stephen A. Northup, Siran S. Faulders, Stephen C. Piepgrass, TROUTMAN SANDERS, L.L.P., Richmond, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

This case concerns the treatment of a severely disabled little girl, H.H., by the Appellants, a special education teacher and a teaching assistant. H.H. and her mother, the Appellees, have alleged, in an action brought under 42 U.S.C. § 1983 (2000), that Appellants maliciously kept H.H. restrained in her wheelchair for hours at a time during the school day, while they ignored her, verbally abused her, and schemed to deprive her of educational services. The evidence taken in the light most favorable to the Appellees demonstrates that Appellants' conduct violated H.H.'s clearly established right to freedom from undue restraint under the Fourteenth Amendment, and Appellants are therefore not entitled to qualified immunity as a matter of law.

I.

Since we are asked to review the district court's handling of the Appellants' motion for summary judgment, we present the facts in the light most favorable to the Appellees. H.H., age seven at the time of the filing of briefs in this appeal, was born with cerebral palsy and a neurological condition known as polymicrogyria, a seizure-causing disorder. According to her mother, H.F., although H.H. is disabled, she "can crawl around and is very mobile," engaging in activities like "looking at

books, playing with musical instruments/toys, swinging, being with other children, playing on the computer and crawling on playgrounds." (J.A. 368.) But, because she cannot yet walk on her own, H.H. is transported in a wheelchair equipped with a safety strap that prevents her from falling out.

From September 2002 until June 2005, H.H. was enrolled in pre-school at Marguerite Christian Elementary School in Chesterfield County, Virginia. According to H.F., H.H. was happy at Marguerite Christian and was always an active participant in her class. At the end of the 2004-2005 school year, H.H. graduated from pre-school and was assigned to a kindergarten program at Chesterfield County's O.B. Gates Elementary School ("O.B. Gates") for the 2005-2006 school year. O.B. Gates is a magnet school that serves both general education students and students with special needs and disabilities.

There is some dispute about whether H.H. had an Individual Education Plan ("IEP") in place for her time at O.B. Gates, in accordance with the Individuals with Disabilities in Education Act. However, it is undisputed that, whether by IEP or otherwise, H.H.'s schedule was supposed to include the following activities outside of her wheelchair: 60 minutes of individual physical therapy every 2 weeks to help her strengthen her legs; group and individual speech therapy (both in and out of her chair) for 1 hour every week; group physical education training

4

for 25-30 minutes every week; hygiene instruction, including toilet training, 3 times a day every day; floor play, at least twice a day; mobility training for 30 minutes every day; and recess (where she played both in and out of her chair) for 30 minutes every day. Scheduled activities in which H.H. generally was to remain seated included: 90 minutes of individual occupational therapy every 2 weeks; group music training for 20 minutes every week; group library training for 20 minutes every week; group art training for 20 minutes every week; lunch in the cafeteria for 30 minutes every day; and classroom group circle time for an hour every day.

H.H. was assigned to Wanda Moffett's multi-aged class of students with severe disabilities at O.B. Gates. Ann Minguzzi was Moffett's teacher's aide that year. According to H.F., Moffett displayed hostility towards her and her daughter from the beginning of the year. Moffett was allegedly especially resistant to H.H. spending time outside of her wheelchair, even though H.F. informed Moffett that her daughter hated to be confined in the wheelchair and was a very active child.

H.F. began to notice that her daughter was becoming increasingly distressed, anxious, and angry about her experiences at O.B. Gates. Every day as they approached the school, H.H. would begin to cry or scream. Often when H.F. returned to pick H.H. up from school, her daughter would be

5

screaming. H.H.'s time at home after school and on the weekends was generally "calm and happy" by contrast. (J.A. 371.) According to H.F., H.H. also began to experience an increasing number of "grand mal" seizures[1] during the 2005-2006 school year, to the point where her doctor contemplated performing major corrective brain surgery.

Based on the changes she noticed in her daughter, H.F. became suspicious about the kind of treatment H.H. was receiving at O.B. Gates, so she placed a small recording device on H.H.'s wheelchair from April 18-20, 2006.[2] According to H.F., the recordings "establish that H.H. spent most of her time confined in the wheelchair," based on the noises H.H. makes throughout the recordings and based on the proximity of H.H.'s voice to the microphone.[3] H.F. also claims that the recordings show that H.H.

---

[1] "Grand mal" seizures are ones involving the entire body. They are characterized by a loss of consciousness and violent muscle contractions.

[2] In the district court, Appellants have challenged the admissibility of evidence from the recording device as a violation of the Federal Wiretapping Act, 18 U.S.C. § 2510 et seq. (2006). For the limited purpose of this appeal, we will assume admissibility.

[3] This Court has been provided with copies of the audio recordings obtained by H.F.; however, the quality of the recordings and the amount of environmental noise make it difficult to hear clearly what transpired. Because this comes to us on summary judgment, we will assume H.F.'s interpretation of the recordings.

received almost no educational services.[4] Instead, Moffett and Minguzzi kept H.H. in her chair and ignored her, spending their time gossiping, making fun of both H.H. and other children in the school, and conspiring about how to prevent H.H. from receiving extended school-year services. The audio recordings allegedly capture adult voices telling H.H. that she is "gross," "coddled," and "has a face only a mother could love." The recordings also suggest that Appellants may have been planning to sabotage an upcoming IEP meeting by instructing other school employees to say as little as possible at the meeting so that H.H. would not be offered extended school year services. At one point, when H.H. screamed or cried to get the adults' attention, H.F. claims the audiotape indicates that an adult voice responded, "HEY! Shut the f--- up!"[5] (J.A. 372.) After hearing the recordings, H.F. immediately removed H.H. from O.B. Gates. H.H. has not experienced a "grand mal" seizure since then.

---

[4] At the start of the school year, Moffett's class had six children in it, but as the year progressed, some of the students transferred or left because of illness, leaving only two students (including H.H.) who regularly attended, and one other who was on the class roll but was frequently absent. On the days when the audio recording device was active, H.H. was often the only child in the classroom.

[5] Both Moffett and Minguzzi deny ever making this statement. The audio recording is rather muffled at this point, and Moffett suggests that the statement may have been, "[P]ut the stuff up." (Appellants' Reply Br. at 16 n.10.)

7

On April 17, 2007, H.F. filed a complaint in the United States District Court for the Eastern District of Virginia, on behalf of her daughter and herself, against Moffett, Minguzzi, the Chesterfield County School Board ("CCSB"), and Superintendent of Chesterfield County Schools Marcus Newsome. The complaint included a claim under 42 U.S.C. § 1983 (2000), alleging a violation of H.H.'s Fourteenth Amendment rights, as well as common law claims of intentional infliction of emotional distress and false imprisonment, and claims of violations of the Americans with Disabilities Act and the Rehabilitation Act. On September 7, 2007, Moffett and Minguzzi filed a motion for summary judgment, in which they asserted that they were entitled to qualified immunity on Appellees' § 1983 claim. H.H. responded with a motion for a continuance pursuant to Federal Rule of Civil Procedure 56(f) to allow her to obtain additional discovery to support her opposition to Moffett and Minguzzi's motion for summary judgment. Moffett and Minguzzi filed a motion for a protective order on October 26 to suspend discovery on grounds of qualified immunity.

After a hearing on the motions, the district court entered an order granting the plaintiffs' motion for a continuance under Rule 56(f), holding Moffett and Minguzzi's motion for summary judgment in abeyance until plaintiffs "have completed discovery," and denying Moffett and Minguzzi's motion for a

8

protective order.[6]  (J.A. 556.)  The district court found that the parties disputed material facts regarding defendants' treatment of the plaintiffs that would affect the outcome of the case, and that much of the relevant evidence was in the control of defendants.  Thus, in the district court's view, defendants' motion for summary judgment was "premature" and the court would defer ruling on it until plaintiffs had "adequate time to conduct discovery."  (J.A. 551-52.)  The district court went on to find that plaintiffs had alleged "the violation of a constitutional right . . . [that] was clearly established at the time of the alleged violation."  (J.A. 553.)

Moffett and Minguzzi now appeal this order, arguing that the district court did not have the authority to hold their motion for summary judgment in abeyance because they were entitled to qualified immunity as a matter of law.

II.

Before we consider the merits of Moffett and Minguzzi's appeal, we must first resolve a threshold jurisdictional

---

[6] The district court also granted Newsome's motion to dismiss and granted in part and denied in part CCSB's motion to dismiss.  The court found that CCSB was entitled to sovereign immunity on Appellees' state tort claims, but that additional discovery was needed to determine whether the school board could be held liable for its employees' conduct under § 1983.

9

question raised by the Appellees. Appellants claim that we have jurisdiction to hear this appeal under <u>Mitchell v. Forsyth</u>, 472 U.S. 511 (1985). Appellees counter, however, that a decision to hold a motion for summary judgment in abeyance is not an immediately appealable final decision, even under <u>Mitchell</u>.

Section 1291 of Title 28 of the United States Code vests courts of appeals with "jurisdiction of appeals from all final decisions of the district courts of the United States." Denials of motions for summary judgment are generally not considered "final decisions" and are therefore not appealable. <u>See</u> <u>Smith v. Diffee Ford-Lincoln-Mercury, Inc.</u>, 298 F.3d 955, 966 (10th Cir. 2002). But, in <u>Mitchell</u>, the Supreme Court recognized that denials of qualified immunity at the summary judgment stage fell within the scope of the collateral order doctrine and were properly appealable "final decisions" under 28 U.S.C. § 1291.[7] 472 U.S. at 524-30.

---

[7] The collateral order doctrine, as articulated in <u>Cohen v. Beneficial Industrial Loan Corp.</u>, 337 U.S. 541, 546 (1949), allows for interlocutory review of certain issues within a case where those issues "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Essentially there are three criteria necessary for <u>Cohen</u>'s collateral order exception to apply: the order over which review is sought must conclusively determine the disputed questions; it must be independent of the merits of the underlying action; and it must regard a claim that would be effectively unreviewable if appeal was delayed until
(Continued)

10

The Mitchell Court recognized that, because qualified immunity is "an immunity from suit rather than a mere defense to liability," the entitlement "is effectively lost if a case is erroneously permitted to go to trial." Id. at 526. Thus a denial of summary judgment "conclusively determines the defendant's claim of right not to stand trial on the plaintiff's allegations." Id. at 527 (emphasis omitted). Moreover, a qualified immunity determination presents a discrete question of law -- "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions" -- that does not require the court to "consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim." Id. at 528.

If Moffett and Minguzzi were appealing an outright denial of qualified immunity then their appeal would plainly be reviewable under Mitchell. But here, the district court has placed Appellants' motion for summary judgment in abeyance until plaintiffs "have completed discovery." (J.A. 556.) Thus,

---

the termination of district court proceedings. Id. at 546. In Mitchell, the Court found that a denial of qualified immunity meets all three of the Cohen collateral order criteria. Mitchell, 472 U.S. at 524-30.

Appellees argue, "the district court never made any sort of final ruling." (Appellees' Br. at 3.)

Whatever the technical merits of this argument, it is indisputable that the district court has effectively decided the discrete question of law that is now being appealed -- whether, under the facts alleged by Appellees, Moffett and Minguzzi have violated Appellees' clearly established constitutional rights. In its Memorandum Opinion, the district court says plainly that it has "determined that plaintiff's complaint does allege the violation of a constitutional right, and that the right was clearly established at the time of the alleged violation." (J.A. 553.) The district court only placed the motion for summary judgment in abeyance so that Appellees could take additional discovery in order to demonstrate that, as a factual matter, Moffett and Minguzzi had violated their constitutional rights.

Allowing Appellees to now force Moffett and Minguzzi into discovery, without recourse to appeal the district court's legal finding, would contravene the spirit of the Supreme Court's decision in Mitchell. Mitchell underscored that "even such pretrial matters as discovery are to be avoided if possible." 472 U.S. at 526. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the

12

commencement of discovery."[8]  Id. (emphasis added); see also

Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other

grounds by Pearson v. Callahan, 129 S. Ct. 808 (2009) ("[W]e

repeatedly have stressed the importance of resolving immunity

questions at the earliest possible stage in litigation."

(internal citation and quotations omitted)); Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1982) ("Until this threshold

immunity question is resolved, discovery should not be

allowed."); cf. Johnson v. Jones, 515 U.S. 304, 313 (1995)

(limiting Mitchell to allow only qualified immunity appeals that

are based on a claim that the judge, taking the facts as given,

erred as a matter of law in finding a violation of clearly

established law); Winfield v. Bass, 106 F.3d 525, 529-30 (4th

Cir. 1997) (en banc) (same).

---

[8]  Appellees observe that, even if qualified immunity
protects Moffett and Minguzzi from the § 1983 claim, it is no
defense to Appellees' state law claims of intentional infliction
of emotional distress and false imprisonment.  Thus, Appellees
argue that a ruling on the qualified immunity issue would be
premature "[b]ecause the burden of discovery will fall on the
government and its agents no matter what the outcome of the
qualified immunity question."  (Appellees' Br. at 48.)  In
Behrens v. Pelletier, 516 U.S. 299, 312 (1996), the Supreme
Court rejected just such an argument, noting that the "right to
[qualified] immunity is a right to immunity from certain claims,
not from litigation in general; when immunity with respect to
those claims has been finally denied, appeal must be available,
and cannot be foreclosed by the mere addition of other claims to
the suit."

13

Several of our sister circuits have found that similar deferrals of decision on an immunity claim were immediately appealable.  In X-Men Security, Inc. v. Pataki, 196 F.3d 56, 64, 67 (2d Cir. 1999), for example, the Second Circuit determined that it had jurisdiction to review a district court's rejection of the defendant's claim of qualified immunity which was found to be "premature in advance of discovery."  The court explained:

> Where the district court bases its refusal to grant a qualified-immunity motion on the premise that the court is unable to, or prefers not to, determine the motion without discovery into the alleged facts, that refusal constitutes at least an implicit decision that the complaint alleges a constitutional claim on which relief can be granted.  That purely legal decision does not turn on whether the plaintiff can in fact elicit any evidence to support his allegations; it thus possesses the requisite finality for immediate appealability under the collateral order doctrine. . . .  A district court's perceived need for discovery does not impede immediate appellate review of the legal questions of whether there is a constitutional right at all and, if so, whether it was clearly established at the time of the alleged conduct . . . .

Id. at 66-67; see also Summers v. Leis, 368 F.3d 881, 887 (6th Cir. 2004) ("This Court finds that the district court's refusal to address the merits of the defendant's motion asserting qualified immunity constitutes a conclusive determination for the purposes of allowing an interlocutory appeal."); cf. Wicks v. Miss. State Employment Servs., 41 F.3d 991, 995 (5th Cir. 1995) (reversing a district court's denial of a protective order intended to prevent discovery prior to consideration of a

14

defendant's motion to dismiss on qualified immunity grounds); Valiente v. Rivera, 966 F.2d 21, 23 (1st Cir. 1992) (finding immediately appealable a district court's refusal to entertain a qualified immunity claim on summary judgment); Smith v. Reagan, 841 F.2d 28, 31 (2d Cir. 1988) ("By holding the decision [on the State's Eleventh Amendment immunity motion] in abeyance pending the completion of all discovery in the case, the district court effectively denied that right.").

Here the district court plainly decided that, as a matter of law, Moffett and Minguzzi's alleged conduct violated Appellees' clearly established constitutional rights. The fact that this decision was made in the context of placing Moffett and Minguzzi's motion for summary judgment in abeyance does not place it outside the realm of the collateral order doctrine. We find, therefore, that we have jurisdiction to review this discrete question of law.

III.

Turning now to the merits of the appeal, Appellants are entitled to qualified immunity if they can show that they have not violated Appellees' clearly established constitutional rights. Harlow, 457 U.S. at 818. Appellees argue that Moffett and Minguzzi violated H.H.'s clearly established substantive due process right to freedom from undue restraint by keeping her

15

physically restrained in her wheelchair for hours at a time. We agree inasmuch as the facts alleged by Appellees create a reasonable inference that the Appellants' conduct was motivated by malice.

We have long recognized that "'[liberty] from bodily restraint . . . [lies at] the core of the liberty protected by the Due Process Clause [of the Fourteenth Amendment].'" Youngberg v. Romeo, 457 U.S. 307, 316 (1982) (quoting Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 18 (1979) (Powell, J., concurring in part and dissenting in part)). Because restraint cases require us to balance an individual's liberty interest against a state interest in using the restraint, "[t]he question . . . is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint . . . is such as to violate due process." Id. at 320. In Youngberg, for example, we found that a state mental institution could "not restrain residents except when and to the extent professional judgment deems this necessary . . . ." Id. at 324.

In this case, conceivable legitimate justifications exist for keeping H.H. strapped into her wheelchair. It is undisputed that, because of her disabilities, H.H. could not be seated

safely in her chair without the use of some sort of restraint.[9] Furthermore, during the course of a normal school day, H.H. would often need to be seated while being instructed. However, on Appellees' facts, it was not educational or safety concerns that motivated Appellants' conduct. Nor even was it merely laziness or incompetence. Instead, Appellees suggest that Appellants made the decision to keep H.H. restrained "for long periods of time . . . . with malice . . . [and] with callous and deliberate indifference toward the rights of H.H."[10] (J.A. 19.) Appellees have supported these allegations with evidence of Appellants' animus, namely their early hostility towards H.H., their cruel and verbally abusive remarks to the child, and their comments suggesting that they were conspiring to prevent from her getting educational services to which she might otherwise have been entitled. Appellees' allegations are all the more concerning given H.H.'s limited ability to communicate verbally,

----

[9] H.H.'s wheelchair is equipped with a lap belt for just this reason. H.H.'s other seating option in her classroom was a Rifton chair -- a chair adapted especially to provide extra upper body support to children with severe disabilities. The chair employs a belt system to keep a disabled child upright and also comes with a tray attachment. (See J.A. 307.)

[10] We need make no judgment as to whether H.H.'s substantive due process rights would be implicated if Appellants had acted out of laziness or incompetence because Appellees have alleged that Appellants acted out of malice.

17

meaning that she could neither report nor reject the Appellants' conduct.

Where the use of a restraint is "so inspired by malice . . . that it amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience," we cannot but find that it violates an individual's substantive due process rights. Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980) (emphasis added). Here, if Moffett and Minguzzi were physically restraining H.H. for hours on end, and using that time to verbally abuse her and strategize against her, that behavior certainly shocks the conscience. In such circumstances, we also must conclude that Appellants violated clearly established law, as a reasonable teacher would plainly recognize that maliciously restraining a child for long periods of time was unlawful. See Jefferson v. Ysleta Independent School District, 817 F.2d 303 (5th Cir. 1987) (affirming denial of qualified immunity where teacher tied an eight-year-old child to her chair with a jump rope for almost two full school days); cf. Heidemann v. Rother, 84 F.3d 1021, 1029 (8th Cir. 1996) (granting qualified immunity where teachers used a blanket restraint on a developmentally disabled child at the direction of a physical therapist).

The dissent would find Moffett and Minguzzi entitled to qualified immunity because "we have not found any case that

18

holds that a teacher, who straps a disabled child in her wheelchair in the classroom, violates the child's constitutional right to be free from restraint." (Diss. Op. at 1-2). Yet we need not identify a case that is "factually on all-fours" in order to find that a clearly established right has been violated. Jefferson, 817 F.2d at 305; see also Hope v. Pelzer, 536 U.S. 730, 739 (2002). Rather, "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Hope, 536 U.S. at 739 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

We have little difficulty finding that a reasonable teacher would know that maliciously restraining a child in her chair for hours at a time interferes with that child's constitutional liberty interests. In Jefferson, the court found that, where plaintiffs alleged that a teacher had tied an eight-year-old student to a chair with a jump rope for an entire school day, the teacher was not entitled to a defense of qualified immunity. 817 F.2d 303. The use of the jump rope restraint was found to violate the child's right to freedom from undue bodily restraint even though it was supposedly being employed "as part of an instructional technique imposed by school policy." Id. at 304. Jefferson thus reinforced the point made in Hall: even where a teacher may have a conceivably permissible justification for use

19

of a restraint, her actions will not be protected by qualified immunity when they amount to an "abuse of official power literally shocking to the conscience." Hall, 621 F.2d at 613.

The Eighth Circuit's decision in Heidemann is not to the contrary. In that case, a disabled child's special education teachers received qualified immunity for their use of a blanket restraint because the court found that the restraint was employed at the advice of a licensed physical therapist under contract with the school. Heidemann, 84 F.3d at 1029. The facts of Heidemann are a far cry from the "abuse of official power," Hall, 621 F.2d at 613, that is alleged here.

We stress that Appellees' facts make this an unusual case, and our opinion is one that no reasonable teacher who errs in judgment ought to fear. Qualified immunity is intended to protect officials who make reasonable mistakes about the law. Saucier, 533 U.S. at 206. But the immunity simply does not extend protection to an official motivated by the kind of bad faith alleged here.[11]

---

[11] Today's opinion does not, as the dissent worries, "creat[e] a right of public school children either to be instructed or to be free to roam the classroom as they wish." (Diss. Op. at 6.) It simply recognizes that a teacher who maliciously employs physical restraints to keep a student in her seat for long periods of time violates that child's clearly established constitutional rights.

20

IV.

This appeal came to us as a challenge to the district court's decision to hold Appellants' motion for summary judgment in abeyance, grant the Appellees' motion for a Rule 56(f) continuance, and deny the Appellants' motion for a protective order. The Appellants have argued that they were entitled to qualified immunity and that we should accordingly reverse these three rulings. Because we have found that, on the facts taken in the light most favorable to Appellees, the Appellants are not entitled to qualified immunity as a matter of law, and because Appellants have raised no other question of error on the part of the district court, we affirm and remand to the district court for further proceedings consistent with this opinion.

AFFIRMED AND REMANDED

NIEMEYER, Circuit Judge, dissenting:

H.H., a severely disabled seven-year old girl -- she can neither walk nor talk -- and her mother commenced this action against two public school teachers for strapping H.H. into a wheelchair for too extensive a time, even though strapping H.H. into the chair was necessary to enable her to sit up in her chair. As the majority notes, "It is undisputed that, because of her disability, H.H. could not be seated safely in her chair without the use of some sort of restraint." While the educational undertaking, and indeed her Individual Education Plan, required that H.H. be strapped in her chair for most of the school day, H.H.'s mother contends that the teachers strapped her in too long in furtherance of their own convenience and that the teachers maliciously mocked the child's disability while she was in her chair. Based on these allegations, H.H. and her mother contend that the teachers violated H.H.'s constitutional right to be free from undue restraint.

The teachers contend that H.H. and her mother have not alleged a violation of a constitutional right, much less a well-established constitutional right of which they should have been aware. Accordingly, they claim that the complaint should be dismissed, based on their qualified immunity, and I agree.

22

To begin with, we have not found any case that holds that a teacher, who straps a disabled child in her wheelchair in the classroom, violates the child's constitutional right to be free from restraint, even if the child is strapped in her chair a few hours longer than anticipated by the educational program and even if the restraint is imposed for improper motives. Any assumption that such a constitutional right exists as a well established right so that a reasonable teacher would know that she is violating the constitution has no basis in any Supreme Court case or Fourth Circuit case. Indeed, the closest case decided in our circuit involved a claim that police officers, who handcuffed a prisoner to a light pole in the middle of a deserted parking lot and left the prisoner there for hours until the police officers from another county could pick the prisoner up, violated the prisoner's constitutional rights. See Robles v. Prince George's County, Md., 302 F.3d 262 (4th Cir. 2002). In that case, we held that the police officers did not violate a well-established constitutional right. Id. at 270.

The most analogous decision we could find is the Eighth Circuit's decision in Heidemann v. Rother, 84 F.3d 1021 (8th Cir. 1996), where the plaintiff, a nine-year old nonverbal child with severe mental and physical disabilities, claimed her teachers violated her constitutional rights when they used a

23

therapeutic treatment referred to as "blanket wrapping." Under the procedure, the child was bound with a blanket so that she could not use her arms, legs, or hands for hours at a time. Despite the fact that the plaintiff alleged that the "blanket wrapping was used as a means of physical restraint . . . [and] that it was administered as a substitute for educational and habilitative programming merely for defendants' convenience," id. at 1026, the Eighth Circuit held that the teachers' conduct did not amount to a constitutional violation and that the teachers were entitled to qualified immunity. The court concluded that "even if the blanket wrapping treatment did constitute a substantial departure from professional norms, . . . . a reasonable official would not have known that to be true." Id. at 1029.

H.H. and her mother have struggled both in their briefs and at oral argument to define a precise constitutional right that the teachers in this case allegedly violated. Ultimately they settled on the teachers' "purposeless physical restraint" of H.H. in her chair, contending that it violated H.H.'s right to be free from unjustified bodily restraint, as protected by the Due Process Clause of the Fourteenth Amendment. They argued that the teachers violated H.H.'s protected liberty interest by

24

keeping her "unnecessarily strapped and restrained in her wheelchair for hours at a time."

On the record in this case, however, I simply cannot understand how one can contend that the physical restraint of H.H. was "purposeless." The lap belt on H.H.'s chair had a very clear purpose, as her mother recognized, because H.H. could not be seated safely in her chair without being strapped in it. When we take the lap belt itself out of the calculus, we are left with a claim that keeping H.H. in her chair "for hours at a time" without instruction was in effect a purposeless and a constitutionally violative governmental restraint. Stated otherwise, H.H. and her mother must, of necessity, be contending that H.H. had a constitutional right to be instructed or to be out of her wheelchair. But school children are routinely required to sit in their chairs "hours at a time," at the sole judgment of the teacher. Surely if a teacher required a classroom of students to be seated for a full school day because the teacher did not wish to teach the students or to interact with them, she would not be depriving the students of constitutionally protected liberty. I therefore, cannot understand how H.H. and her mother can claim a constitutional right for H.H. not to be kept in her chair for hours at a time

25

when similarly situated non-disabled children do not have such a right.

By denying the teachers in this case qualified immunity, the majority seems to insist (1) that the teachers should have knowledge of some constitutional right that has not yet been defined by the Supreme Court or by the Fourth Circuit, and (2) that the teachers deliberately violated that constitutional right. Qualified immunity protects public school teachers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable [school teacher] would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). And the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [school teacher] that [her] conduct was unlawful in the situation [she] confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001) (emphasis added) (citing Wilson v. Layne, 526 U.S. 603, 615 (1999) ("[A]s we explained in Anderson, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established" (emphasis added))).

Neither the plaintiffs nor the majority have identified any case that would instruct the teachers in this case that their

26

conduct, even if improperly motivated, violated H.H.'s constitutional rights. The closest they come is a single, factually distinguishable case out of the Fifth Circuit, in which a teacher punished a nine-year old child by tying her to a chair with a jump rope for almost two school days, not allowing her even to use the restroom. See Jefferson v. Ysleta Indep. Sch. Dist., 817 F.2d 303, 304-5 (5th Cir. 1987). Of course, the jump rope was not required for any safety consideration, as here, but rather was used to punish the child. Id.

In sum, the majority seems to be creating a right of public school children either to be instructed or to be free to roam the classroom as they wish. While H.H. and her mother may have claims for alleged failures to educate H.H. properly, they should not be allowed to morph those claims into constitutional claims against teachers in their personal capacity. I submit that the implication of the majority's holding, which plows entirely new ground, is far-reaching and leaves public school teachers exposed to constitutional claims in circumstances where they may have simply exercised poor judgment, even for unacceptable reasons. Because we erroneously deny these school teachers qualified immunity, I dissent.