**Wendy E. WEBB, et al.,**
**Plaintiffs-Appellants,**

v.

**Thomas T. McCULLOUGH, et al.,**
**Defendants-Appellees.**

No. 86–5352.

United States Court of Appeals,
Sixth Circuit.

Submitted May 8, 1987.

Decided Sept. 17, 1987.

---

Roy Webb, Elaine Webb, Wendy E. Webb. pro se.

Randall L. Nelson, Eugene Collins and Associates, Chattanooga, Tenn., W. Lee Maddux, for defendants-appellees.

Before GUY and BOGGS, Circuit Judges and EDWARDS, Senior Circuit Judge.

BOGGS, Circuit Judge.

Wendy Webb (Webb) was sent home early from a high school trip to Hawaii and suspended from school after a search of

her hotel room revealed alleged violations of school and trip rules. She sued the school administrators for alleged violations of her Fourth and Fourteenth Amendment rights. The district court granted defendants summary judgment on all the federal claims based on the searches and suspensions, and therefore dismissed pendent state claims. We affirm the grant of summary judgment on the searches and suspensions, but remand due to the possibility that an alleged battery violated Webb's substantive due process rights.

## I

Webb joined about 140 other members of the Hixson High School Band in a trip to Hawaii for a band competition in late March 1985. On March 29, Webb and her roommates were getting ready to go shopping when Appellee Thomas McCullough, the Hixson High School Principal, (McCullough), used a key to enter their hotel room without warning, in the company of Mr. Crumley, a chaperone, according to Webb. All four roommates were present, one in bra and shorts. The two men left, and Mrs. McCullough entered and told the girls to finish dressing. According to McCullough, he announced his and Crumley's presence before entering, and his wife entered first to assure that the girls were dressed. McCullough and Crumley re-entered, and according to Webb, informed the girls that the front desk had told him to search the room for alcoholic beverages. He searched the bedroom, bathroom, and Webb's suitcase, including "personal hygiene items." Neither that search nor contemporaneous searches of other students' rooms found any alcoholic beverages.

That evening, McCullough held a meeting and told students that he had reason to believe that the rules had been violated. According to Webb, McCullough told the group that anyone caught with alcohol or illegal drugs would be sent home, and anyone who violated curfew would have to come in earlier the following night. The students were dismissed at approximately 10:50 p.m. and Webb and her roommates went back to their room.

As Webb and her roommates returned to their room, they saw another female student in the hall, talking to two unknown boys. The girl and the two boys then came to Webb's door and Webb and her roommates sat in the hall immediately outside the door to their room talking with them. Webb's chaperone, Mrs. Bandy, gave Webb and the roommate permission to stay there until Bandy had completed her room checks.

According to Webb, there was a phone call for her as she sat talking with the other girls and the two boys, which she entered the room to answer. One of the boys followed Webb. According to Webb, she told him he couldn't stay, and went into the hallway to ask her roommates why he was in the room. McCullough then told Webb and her roommates to go into their room. They replied that they had been given permission by their chaperone to stay there for a while.

McCullough then directed the one boy in the hall to leave and told the girls to go to their room. Webb and the roommates went into their room. According to McCullough, he entered the room and found no one else present, whereupon he left. Webb disputes this, claiming that only Bandy came in shortly thereafter to discuss the next day's schedule. Neither party states any knowledge of the other boy's whereabouts, at that point.

According to McCullough, upon being informed by one of the chaperones that some students had used an unoccupied room adjacent to, and sharing a balcony with, Webb's room the previous night, he notified a hotel security officer, who opened the room. Upon entering, McCullough saw a teenage boy on the balcony of the room. The boy jumped over a barrier between the two sections of the balcony. McCullough then re-entered Webb's room, and saw the boy jump back to the balcony outside the unoccupied room. The boy was then apprehended by the security officer. According to Webb, McCullough then re-entered the room and stated that there was a boy on the balcony. He left, and motioned for Bandy to leave. He then told the girls to

pack their bags because he was sending them home on the first available flight, as a boy had been caught by the security guard. While he was doing this, one of the chaperones found a six-pack of beer and a quart of wine in the adjacent room's refrigerator.

According to the girls, they attempted to offer explanations, but McCullough wouldn't listen. McCullough stated that he found wine and beer in the next room.

According to Webb, McCullough then left, and she locked herself in the bathroom. One roommate was crying, and the other two called for McCullough to return. McCullough was quite angry when he realized Webb was in the bathroom. He tried to jimmy the bathroom door lock, but Webb would not let him in. He then slammed the door three or four times with his shoulder. The door finally gave way, knocking Webb against the wall. McCullough then thrust the door open again, and it struck Webb again, throwing her to the floor. He then grabbed Webb from the floor, threw her against the wall, and slapped her. She then broke away and ran to her roommates.

McCullough telephoned Webb's parents and informed them that she was being sent home. Early the next morning, March 30, he left Webb and her roommates at the airport. Their luggage was sent ahead, and they were left at the airport with stand-by tickets for any flight headed to any city on the mainland, with funds insufficient to buy meals. The girls were not able to obtain seats until approximately 24 hours later. Therefore, they had to spend the night at the airport. After another delay and a detour to Chicago, the girls arrived in Chattanooga at about 3:30 a.m. on April 1, about 36 hours after McCullough abandoned them at the airport in Hawaii.

On April 5, McCullough suspended Webb and the roommates, effective April 8, for violation of curfew, having a male in their room, having liquor in the next room, and trespassing into adjacent rooms of the hotel. Webb contends that Superintendent James McCullough (the Superintendent) knew and approved of the suspension. McCullough (the principal) met with Webb and her parents on April 8. According to Webb, he stated that he had suspended her because her parents had spoken with members of the Board of Education concerning his actions. A meeting with the Superintendent and McCullough followed on April 10. Webb then sought a federal injunction. On April 17, an agreement was reached between Webb's attorney and the City Attorney's office to readmit Webb to school. However, Webb was never allowed to return to band class.

On May 23, 1985, Webb and her parents filed suit against the principal, the Superintendent, the Chattanooga Public Schools, and the Chattanooga Board of Education, alleging violation of her 4th Amendment and 14th Amendment rights and 42 U.S.C. § 1983 as to the search of her room and the suspension, and violation of Tennessee statutory and common law as to the suspension, her property right in the room and food for which she had paid, battering, intentional emotional distress, and publication of false and defamatory matter. When Webb reached her majority, the parent's claim was treated as withdrawn by their counsel, and later by the district court. They do not appeal this decision. Webb is now proceeding *pro se*. Thereafter, the defendants moved for summary judgment under Rule 56, Fed.R.Civ.P. The district court granted summary judgment and dismissed the pendent state law issues as to all defendants. This appeal is from that grant and dismissal.

## II

### A

There can be little doubt that principal Thomas McCullough was a representative of the Chattanooga Public Schools during the trip to Hawaii and hence acting under the color of state law. This is borne out by his own affidavit that:

at all times during the subject trip of the Hixson High School marching band to the state of Hawaii in late March, 1985, [I] served as chaperon[e] for the stu-

dents. *In my capacity as Principal of the school, I was in overall charge of all students on the trip.*

Appendix (App). at 40 (emphasis added). It is also supported by the "Medical Information and Travel Permission" slip which Webb's parents were required to sign. The question therefore arises as to whether there any circumstances under which it is permissible for a public school official to search the private hotel room of a student.

### B

The district court answered this question in the affirmative by examining the searches under the two-part test set out in *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (hereinafter, *TLO* ), which holds that "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.*, 105 S.Ct. at 743–44. The first step is to determine whether the search was justified at its inception by the presence of "reasonable grounds for suspecting that the search will turn up evidence that the student violated or is violating either the law or the rules of the school." *TLO*, 105 S.Ct. at 744. If such grounds existed, the second step renders a search "permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Ibid.*

The district court granted McCullough's motion for summary judgment on the issue of the legality of his searches of Webb's room, concluding that "plaintiffs describe the search of their hotel room and [sic] without specifically stating how their Fourth Amendment rights were violated." App. at 21. The court stated that

> [n]ormally, the reasonableness of any action is a question for the trier of fact. However, under circumstances where the pleadings, affidavits and other documents on file do not raise any genuine issue of material fact on the question of

reasonableness, summary judgment is proper.

App. at 22.

■ Although correct as a matter of abstract law, the district court applied this analysis incorrectly. The record shows that there were disputed issues of fact. McCullough alleged that for the first search he requested permission to enter Webb's room, and his wife entered first. Webb alleged that McCullough entered with a key suddenly and without warning, before his wife, while one of the roommates was partially clad. This constitutes a disputed issue of fact as to the reasonableness of the manner of search. Additionally, Webb complained of the search of her "personal hygiene items." This is an allegation that the scope of the search was unreasonable.

The district court conducted an incomplete analysis of the record, and thereby incorrectly granted summary judgment. Unless there was some factor which made the search reasonable even under plaintiff's view of the circumstances, the case presented questions for the trier of fact, not for a judge ruling on a motion for summary judgment.

### C

■ Although the district court acted correctly by applying the *TLO* analysis, it erred in limiting itself solely to the *TLO* analysis. Although McCullough was a state actor at all times during the trip, the events which led to this suit did not occur in school. The *TLO* court found that school officials' need to search is based on their interest in maintaining discipline in the classroom and on school grounds. 105 S.Ct. at 742–43. Thus, a recurrent theme of *TLO* is that "interests of students ... be invaded no more than necessary to achieve the legitimate end of order in the schools." 105 S.Ct. at 744. Even in stressing that violations of rules dealing with minor infractions could justify a search, the Court still referred to "maintenance of discipline in the schools and preservation of order in the schools." *Id.*, n. 9. This repetitive emphasis on activity *at school* suggests

that the deference extended in *TLO* to searches by school authorities would not apply to the search of a hotel room paid for from a student's own funds or during a non-educational or partially educational field trip than a search in school, unless some other justification is available.

In the setting in which the least process is due, the school, the Supreme Court in *TLO* found permissible the search of a purse of a student who had been observed smoking, but denied smoking. The observation provided the individualized suspicion that the Supreme Court suggested is typically necessary to justify searches.

> We do not decide whether individualized suspicion is an essential element of the reasonableness standard we adopt for searches by school authorities. In other contexts, however, we have held that although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure[,] ... the Fourth Amendment imposes no irreducible requirement of such suspicion." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560–561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where "other safeguards" are available "to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'" *Delaware v. Prouse*, 440 U.S. 648, 654–655, 99 S.Ct. 1391, 1396–1397, 59 L.Ed.2d 660 (1979)....

*TLO*, 105 S.Ct. at 744, n. 8 (citations omitted).

Thus, even if this court accepted the contention that Webb was only due as much process as is necessary for a search in school, the only statement in McCullough's affidavit supporting his motion for summary judgment was an assertion that prior to his first search of Webb's room he "was advised by several chaperones that some students may have consumed alcoholic beverages while on the trip. I was also advised that some students may have had

alcohol and liquor in their rooms." App. at 39. This affidavit does not display particularized suspicion. The record does not reflect that the first search of Webb's room was other than random. Thus, if we look solely to the application of guidelines provided by *TLO* to the facts considered by the district court, it is possible that a jury would find that the search was unreasonable, if defended solely on McCullough's affidavit. Summary judgment based solely on *TLO* would thus be improper.

## D

McCullough had a source of authority for his searches of Webb's room other than his role as Principal of Hixson High School. He also had a limited scope of *in loco parentis* authority over Webb. "A person is said to stand *in loco parentis* when he puts himself in the situation of a lawful parent by assuming the obligations incident to the parental relation[ship] without going through the formalities incident to a legal adoption." 59 Am.Jur.2d *Parent and Child* § 75 (1987). *See generally* 59 Am. Jur.2d *Parent and Child* and cases listed at § 75, n. 62.

We acknowledge that the *in loco parentis* doctrine is no longer recognized as the source of school officials' general authority over pupils. The Supreme Court has noted that *in loco parentis* is not wholly compatible with compulsory school attendance, and cannot generally cloak school officials with the immunities of parents.

> [G]enerally, the Court has recognized that "the concept of parental delegation" as a source of school authority is not entirely "consonant with compulsory education laws." *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Today's public school officials do not merely exercise authority arbitrarily conferred on them by individual parents; rather, they act in furtherance of publicly mandated educational and disciplinary policies.... In carrying out searches and other disciplinary functions pursuant to such policies, school officials act as representatives of the State, not merely as surrogates for the parents, and they

cannot claim the parents' immunity from the strictures of the Fourth Amendment. *TLO*, 105 S.Ct. at 741.

However, *in loco parentis* retains vitality in appropriate circumstances. For instance, one who is *in loco parentis* to a child who is a member of a household acquires the immunity to negligence claims of a natural parent in many jurisdictions. *See generally* 59 Am.Jur.2d *Parent and Child* § 143 (1987) and cases listed at § 143, n. 91. The trip to Hawaii was an appropriate circumstance for the operation of *in loco parentis*. The principal was acting as both a representative of the state and in *loco parentis* in his task of searching Webb's room. As the district court stated:

> It must be remembered that this case arose in the context of a "spring break" trip and that the school officials present were charged with the care and safety of the plaintiffs while they were more than 5,000 miles from home. More so than in an ordinary school situation, the school officials were standing *in loco parentis.* They were faced with the difficult task of supervising the students in an unstructured environment far different from that present within the confines of the schoolhouse. In such a situation, it was incumbent upon the school personnel to be especially vigilant and ready to deal with any violations of the conduct guidelines which had been established for the trip.

App. at 30–31.

The crucial factual difference between the in-school search in *TLO* and the search during a field trip in this case permits, indeed requires, the application of the *in loco parentis* doctrine. Parental permission was required for the field trip. These factors imply several significant conclusions. First, the trip did not involve mandated education, as it was a voluntary undertaking on the part of Webb and the other band members, just as most extracurricular activities are voluntary. This undercuts the rationale given in *TLO* for the rejection there of the *in loco parentis* doctrine.

Second, a greater range of activities occur during extracurricular activities than during school. Thus, there may be a need for a greater range of intervention by an administrator than is the case when a student is only active within the relatively orderly confines of a school.

Third, there are many more ways for a student to be injured or to transgress school rules or laws during a non-curricular field trip than during relatively orderly school hours. To expose administrators and school districts to increased tort liability while denying them the authority necessary to lessen the likelihood of student injury would be inequitable and would probably decrease the range of extracurricular activities schools would offer. Many parents would be reluctant to permit their children to go on field trips if the accompanying school officials' authority to impose supervision were subject to the same Fourth Amendment limitations as apply to local police forces.

Finally, this was a search of Webb's residence, albeit a temporary residence. Such a search simply could not occur in the course of an ordinary school day, the context to which *TLO* applies.

■ However, *TLO* is not wholly inapplicable. The *TLO* opinion rejected the proposition that *in loco parentis* exempted school officials from the Fourth Amendment. 105 S.Ct. at 741. It then held that the Fourth Amendment required that the search be reasonable, considering all the circumstances. Thus, as *in loco parentis* survives in certain prescribed circumstances, McCullough's *in loco parentis* authority is one of the circumstances which must be considered. Although we understand Webb's alleged discomfort at being intruded upon, such embarrassment alone simply does not rise to the level of a constitutional claim, because Webb's factual allegations do not show that the searches exceeded the *in loco parentis* aspect of McCullough's hybrid authority. Thus, there is no genuine issue of material fact on the question of the reasonableness of the searches, and the district court's grant of summary judgment on the issue of the searches is affirmed.

## III

Although McCullough's searches of Webb's room fall within his *in loco parentis* authority, the alleged batteries do not. Indeed, his *in loco parentis* status heightens his responsibility for Webb's well-being.

It is well established that persons have a fourteenth amendment liberty interest in freedom from bodily injury. See *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Ingraham v. Wright*, 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977); *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980).

However, it is important to distinguish the type of battery at issue in the present case from that in *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). In *Wright*, a high school student who was slow to respond to a teacher's instructions was struck on his buttocks with a wooden paddle, and another student was struck on the arms. These blows were *disciplinary* blows, inflicted as punishment for "the proper education and discipline of the child." *Id.* at 670, 97 S.Ct. at 1412.

■ In contrast, the record does not demonstrate that the alleged blows inflicted upon Webb were in any way disciplinary. The record does not show any discussion, indication of the purpose behind the blows, nor that the blows arose other than in anger or from malice.

This raises the possibility that the alleged blows violated Webb's substantive Fourteenth Amendment's due process rights:

[T]he right to be free of state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience.... [is c]learly recognized in persons charged with or suspected of crime and in the custody of police officers[. W]e simply do not see how we can fail also to recognize it in public school children under the discipli-

nary control of public school teachers....

\*   \*   \*   \*   \*   \*

In the context of disciplinary corporal punishment in the public schools, we emphasize once more that the substantive due process claim is quite different than a claim of assault and battery under state tort law. In resolving a state tort claim, decision may well turn on whether ten licks rather than five were excessive, *see Ingraham v. Wright*, 525 F.2d [909] at 917, so that line-drawing this refined may be required. But substantive due process is concerned with violations of personal rights of privacy and bodily security of so different an order of magnitude that inquiry in a particular case simply need not start at the level of concern those distinctions imply. As in the cognate police brutality cases, the substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience. *See Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.1973 (Friendly, J.) Not every violation of state tort and criminal assault laws will be a violation of this constitutional right, but some of course may.

*Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980).

As the Supreme Court stated in *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986),

[h]istorically. the [14th Amendment] guarantee of due process has been applied to *deliberate* decisions of governmental officials to deprive a person of life, liberty, or property, without due process of law.... By requiring the government to follow appropriate procedures when its agents decide to "deprive any person of life, liberty, or property," the Due Process Clause promotes fairness in such decisions. And by barring

certain governmental actions regardless of the fairness of the procedures used to implement them, e.g., *Rochin* [*v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (stomach-pumping)], it serves to prevent governmental power from being "used for purposes of oppression," *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. (59 U.S.) 272, 277, 15 L.Ed. 372 (1856) (discussing Due Process Clause of Fifth Amendment).

*Id.* 106 S.Ct. at 665.

Because the alleged blows were not struck in the school context, where the need for immediate disciplinary control described in *TLO* is at its greatest, because McCullough was *in loco parentis* to Webb, and because it is possible that the blows were not disciplinary in nature, a trier of fact could find that under the circumstances, McCullough's need to strike Webb was so minimal or non-existent that the alleged blows were a brutal and inhumane abuse of McCullough's official power, literally shocking to the conscience. This makes summary judgment inappropriate. We therefore reverse the district court's grant of summary judgment insofar as it applies to the alleged blows, and remand that issue for further proceedings.

## IV

■ Webb alleged that she was denied the right to attend a public education facility without due process of law. In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court held that a student faced with a suspension of ten days or less need only be given minimal due process. Specifically, "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.*, at 581, 95 S.Ct. at 740.

Webb acknowledges in her brief that McCullough heard an explanation from her and informed her of the nature of her infraction. Further, McCullough alleges that Webb and her parents met with him on the morning of April 8 to discuss the suspension. Webb does not deny this allegation. Thus, McCullough has established notice, explanation and opportunity to present. Webb's suspension began on Monday, April 8, 1985 and ended on Wednesday, April 17, 1985, a total of seven school days. Thus, the present case is within the holding of *Goss*, and is controlled by it.

Webb makes several other arguments, which are meritless. She asserts that there is an issue of disputed material fact in that McCullough's affidavit stated that the suspension began on April 5, Good Friday, when school was not in session, rather than April 8, Monday. Even if it were possible for Webb to have been suspended from school when it was not in session, the suspension would not in any event rise above the ten day threshold set in *Goss*.

Webb also argues that the district court stated that McCullough learned that the girls in Webb's room had used the neighboring room the night before the incident, when McCullough's affidavit only stated that he learned that some students had used the room. However, this is not material, as McCullough could have sent the girls home merely for violating the trip rules by having a boy in their room. Webb quotes various sections of the High School's Student-Parent Handbook and Tennessee statutes. Even if McCullough violated these, the violations would not present an issue cognizable in federal court.

Finally, Webb makes an argument which could be construed to assert that she was denied due process of law by McCullough's failure to refer the incident to the school board as required by Tenn.Code Ann. § 49–6–3401(4) (1986 Supp.). However, the record is silent, rather than negative, on the referral; Webb got all the process to which she was entitled under *Goss;* and she had a right of direct appeal to the school board under Tenn.Code Ann. § 49–6–3401(6) (1986 Supp.). Webb had access to additional processes, but failed to act on her rights. We therefore affirm the district court's grant of summary judgment

with respect to the issue of Webb's suspension.

### V

Webb's complaint contained several pendent state claims: outrageous conduct, intentional infliction of emotional distress, publishing false and defamatory matter, and causing the student records to contain false information. Once the district court granted McCullough summary judgment, it dismissed Webb's pendent state claims as well, for the power of a federal court to decide pendent state claims is based on the fact that both the state and federal claims derive from a common nucleus of operative fact. Thus, "[i]f the federal claims are dismissed before trial ... the state claim should be dismissed as well." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

Inasmuch as we have determined that the present case does present one issue which requires further proceedings in the district court, that court will have to determine whether the pendent claims, about which we express no opinion, can survive the dismissal of Webb's claims as to the searches and suspension, which we have affirmed.

The grant of summary judgment is AFFIRMED in part, REVERSED in part, and the case is REMANDED to the district court, for further proceedings in conformity with this opinion.