RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0006p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

EVILLO DOMINGO and JOSEPHINE DOMINGO, individually and as parents and natural guardians of N.D.; RASHEEDAH GRAY, individually and as parent and natural guardian of R.G; ELIZABETH GARCIA, individually and as parent and natural guardian of J.J.,

        *Plaintiffs-Appellants*,

    *v.*

MARSHA KOWALSKI; NORTH POINT EDUCATIONAL SERVICE CENTER; WILLIAM B. LALLY; DAN MCCARTHY; CHARLOTTE WAGNER; KAREN STRENG,

        *Defendants-Appellees*.

No. 14-3957

_____

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:13-cv-00094—Jack Zouhary, District Judge.

Argued: June 10, 2015

Decided and Filed: January 7, 2016

Before: BOGGS and BATCHELDER, Circuit Judges; HUCK, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jason D. Winter, REMINGER CO., LPA, Cleveland, Ohio, for Appellants. Matthew John Markling, MCGOWN & MARKLING CO., L.P.A., Akron, Ohio, for Appellee Kowalski. John D. Latchney, O'TOOLE, MCLAUGHLIN, DOOLEY & PECORA CO., LPA, Sheffield Village, Ohio, for North Point Appellees. **ON BRIEF:** Jason D. Winter, Holly Marie Wilson, Courtney J. Trimacco, REMINGER CO., LPA, Cleveland, Ohio, for Appellants. Matthew John Markling, Patrick Vrobel, Sean Koran, MCGOWN & MARKLING CO., L.P.A.,

---

[*]The Honorable Paul C. Huck, Senior United States District Judge for the Southern District of Florida, sitting by designation.

1

Akron, Ohio, for Appellee Kowalski.     John D. Latchney, O'TOOLE, MCLAUGHLIN, DOOLEY & PECORA CO., LPA, Sheffield Village, Ohio, for North Point Appellees.

HUCK, D.J., delivered the opinion, in which BOGGS and BATCHELDER, JJ., joined in part. BATCHELDER, J. (pg. 18), delivered a separate opinion concurring in part and concurring in the judgment. BOGGS, J. (pp. 19–20), delivered a separate opinion dissenting in part, in which BATCHELDER, J., joined in part.

———————————

**OPINION**

———————————

HUCK, District Judge.  This is an action brought by three special-education students and their parents (Appellants) against special-education teacher Marsha Kowalski, her supervisors, and the North Point Educational Service Center (North Point) (collectively Appellees), for Appellees' alleged violation of Kowalski's students' Fourteenth Amendment rights to substantive due process, in contravention of 42 U.S.C. § 1983.[1]  Appellants allege that Kowalski abused her students during the 2003–2004 school year by, among other things, gagging one student with a bandana to stop him from spitting, strapping another to a toilet to keep her from falling from the toilet, and forcing yet another to sit with her pants down on a training toilet in full view of her classmates to assist her with toilet-training.  Appellants also allege that Kowalski's supervisors were deliberately indifferent to this alleged abuse, and that North Point created an environment primed for abuse by its adoption of allegedly unconstitutional policies and practices.  The district court granted summary judgment to all Appellees because Kowalski's instructional techniques, while inappropriate and even "abusive," did not rise to the conscience-shocking level required of a substantive due process claim; because Kowalski's supervisors had insufficient notice of her actions to be found deliberately indifferent; and because North Point's policies and practices were not constitutionally inadequate.  We affirm the district court's judgment in Kowalski's favor, because as a matter of law, Kowalski's conduct did not violate the Fourteenth Amendment.  Because Appellants failed to show an underlying constitutional

———

[1]Appellants also raised state-law tort claims, which the district court dismissed without prejudice. Appellants have not appealed the dismissal of their state-law claims.

violation, we also affirm the district court's summary judgment in favor of North Point and Kowalski's supervisors.[2]

## I. BACKGROUND

Appellants' factual allegations are based almost entirely on the testimony of Suzanne Brant, who worked as a teaching aide in Kowalski's special-education class of autistic and developmentally delayed students during the 2003–2004 school year. As the year progressed, Brant became increasingly concerned that some of Kowalski's teaching methods were inappropriate and abusive. N.D., for example, was a six-year-old autistic and developmentally delayed girl who was not toilet-trained. N.D. struggled in particular with transitioning from one activity to another, and when forced to do so, she would sometimes throw tantrums, remove her clothes, and smear feces on the floor or wall. According to Brant, "just about every day" Kowalski removed N.D.'s pants and placed N.D. on a training toilet in the classroom, and often left her on the training toilet for as long as a fourth of the school day. Though Laurie Fogg, another teaching aide in the class, claimed that N.D.'s training toilet was separated from the other students by a "partition," she admitted that the students could easily walk around the partition and see N.D. Kowalski left N.D. on the training toilet during mealtimes, and sometimes fed lunch to N.D. while N.D. sat on the toilet. Brant said that Kowalski once "proudly" displayed one of N.D.'s bowel movements to the class. Kowalski believed that N.D.'s difficulties in making smooth transitions between activities merited these particular toilet-training techniques.

Brant also grew concerned over Kowalski's treatment of R.G., a nine-year-old boy with autism and hyperactivity disorder. The record establishes that, while he was a student in Kowalski's classroom, R.G. frequently exhibited behavior that Kowalski, Brant, and Fogg found challenging, including spitting, throwing tantrums, screaming, and tripping others. Brant alleged that, on one occasion in February 2004, she found R.G. strapped to a gurney in the hallway

---

[2]As noted above, in addition to finding that Appellants' supervisory and *Monell* claims failed for lack of an underlying constitutional violation, the district court also held, in the alternative, that Appellants had not satisfied the substantive requirements of § 1983 supervisory and *Monell* claims. However, because we conclude that the district court properly held that Appellants had not shown an underlying violation of their Fourteenth Amendment rights, we do not address the district court's alternative bases for granting summary judgment to Kowalski's supervisors and North Point.

outside of the classroom, his mouth gagged with a bandana. Kowalski disputed this. Kowalski claimed that she only briefly covered R.G.'s mouth with a therapeutic "chewy" that R.G. kept around his neck on a bandana, for long enough to tell him to stop spitting, and that she did not restrain R.G. to a gurney. However, accepting Brant's version of events as true, Brant testified that she believed that Kowalski had restrained R.G. on this specific occasion to correct R.G.'s disruptive behavior. Brant also claimed that Kowalski had yelled at R.G. on several occasions, and had inappropriately restrained him several times in a Rifton Chair, a therapeutic chair designed to support children who cannot maintain a safe seated position in a stand-alone chair.

Additionally, Brant was concerned with Kowalski's treatment of J.J., an eleven-year-old girl with cerebral palsy, autism, and developmental delays. According to Brant, Kowalski frequently used a belt to strap J.J. to the toilet, and left her strapped to the toilet, alone in the bathroom, for twenty to thirty minutes at a time. However, as Kowalski explained, J.J. was not toilet-trained, would frequently soil herself when her diaper was removed, and, due to her difficulties balancing and her low muscle tone, might fall from the toilet seat without support. Therefore, Kowalski believed that strapping J.J. to the toilet with a belt was a reasonable measure to employ in assisting J.J. in learning to safely and properly use a toilet. In fact, toilet-training was an explicit goal in J.J.'s individual education plan. Kowalski and Fogg also testified that they always kept J.J. in sight while she was strapped to the toilet.

Finally, Brant became concerned that certain techniques occasionally used by Kowalski to focus her students' attention were abusive and inappropriate. According to Brant, Kowalski would regularly assert control of an unruly or disruptive student by grabbing the student's face, squeezing his or her cheeks, and pointing the student's face toward Kowalski. Brant also claimed that if a student was not focusing or staying on task Kowalski would have the student fold his arms on the desk, and then force the student's head down onto his folded arms.

Neither the students' parents nor Kowalski's supervisors were aware of the full extent of Brant's concerns until after the end of the 2004 school year. In fact, no parent ever complained to the school administrators about any mistreatment or reported any concerns about injury to a child. Kowalski's class met in a church where Kowalski went largely unobserved by other teachers or her direct supervisors, aside from a few weekly visits from behavioral and therapeutic

specialists. Further, due to the students' limited verbal capacities, their parents relied on Kowalski's daily classroom "journal" to keep them informed of the students' progress. Kowalski did not reference any of the above-described teaching techniques in her classroom journal, or otherwise share them with the students' parents. Brant testified that Kowalski even appeared to actively conceal her activities by, for example, removing N.D. from her training toilet shortly before N.D.'s mother arrived to pick her up from school.

Despite her concerns, Brant remained largely silent for most of the school year. In November 2003, Brant complained to Charlotte Wagner, North Point director of curriculum and instruction in Huron County, and Karen Streng, Kowalski's direct supervisor, that Kowalski had skipped work for a doctor's appointment without going through North Point's formal time-off request process. Following Brant's complaint, Streng and Wagner visited Kowalski's classroom, and Brant complained to them of Kowalski's inappropriate toilet-training of another student, J.F.[3] Streng and Wagner told Brant that, if she suspected that Kowalski had abused J.F., she should file a complaint with the appropriate state authorities. Streng later told Kowalski in general terms that she should not leave children on the toilet unattended for a long period of time. The record indicates that Kowalski's supervisors heard no similar complaints about Kowalski until March 2004, when an unnamed "therapy supervisor" visited Kowalski's class and witnessed Kowalski placing N.D. on a training toilet in view of other students. The therapy supervisor complained to Streng, who instructed Kowalski to stop.

It was not, however, until after North Point indicated that it would not re-employ Brant that she made known the full scope of her concerns. On April 20, 2004, North Point Superintendent William Lally informed Brant that he intended to recommend to the North Point board that it not re-employ Brant for the following school year, for financial reasons. A month later, Brant complained to Streng that Kowalski was "being mean" to the students and was "obsessed" with toilet-training. Brant complained, specifically, that Kowalski had yelled at R.G. and had placed J.J. in a Rifton Chair as punishment. There is no evidence that Streng or Wagner took any action on these complaints.

---

[3]J.F. was originally a plaintiff in this suit. The district court dismissed J.F.'s claims as barred by *res judicata*, because a prior suit filed by J.F.'s parents was dismissed by an Ohio state court for failure to prosecute. Appellants have voluntarily dismissed J.F.'s appeal.

Finally, on June 18, 2004—after the end of the school year—Brant met with Lally and Daniel McCarthy, North Point's regional director, to more fully express her concerns. For the first time, Brant described everything she had witnessed in Kowalski's classroom that troubled her, including Kowalski's binding and gagging of R.G.; her inappropriate toilet-training of J.J. and N.D.; and her inappropriate attention-focusing techniques. According to Brant, Lally was angry that she had not reported these concerns sooner, and recommended that she file a complaint of child abuse with the appropriate state authorities. On July 1, 2004, Brant filed a written report of child abuse with the Huron Department of Job and Family Services.

Lally subsequently contacted Erie County Children's Services, the Norwalk Law Director, the Norwalk Police Department, and the Ohio Department of Education, all of which investigated Brant's allegations. McCarthy also initiated an internal investigation. North Point suspended Kowalski for a year with pay, pending completion of these investigations. No investigation resulted in any charges or sanctions. The Norwalk Police Department brought no criminal charges, and the Norwalk Law Director concluded that he found "insufficient credible evidence against Kowalski to substantiate the filing of criminal charges." The Ohio Department of Education concluded its investigation with a consent agreement in which Kowalski denied any wrongdoing, but agreed to complete twenty to thirty "contact hours" of college-level special-education coursework.

Kowalski fulfilled the terms of the consent agreement in July 2007. As of May 2013, North Point still employed her. The record indicates, however, that North Point has reassigned Kowalski as an itinerant teacher and has not provided her with her own classroom since 2004, nor has it permitted her to teach unsupervised. No one has accused Kowalski of child abuse since 2004.

Appellants filed this action in the Erie County Court of Common Pleas, asserting several state-law tort claims and a single claim based on Appellees' alleged liability under 42 U.S.C. § 1983. Appellees removed to the United States District Court for the Northern District of Ohio on the basis of federal question jurisdiction on January 14, 2013. Appellees filed motions for summary judgment on January 24, 2014, which the district court granted on August 29, 2014.

The district court found that Brant's allegations, taken as true, indicated that Kowalski "almost certainly engaged in child abuse." However, the district court, in granting summary judgment, distinguished abusive behavior from unconstitutional behavior. The district court found that Kowalski's actions, while inappropriate, did not rise to the level of a violation of the students' substantive due process rights. The district court also granted summary judgment on Appellants' supervisory claims against Streng, Wagner, Lally, and McCarthy, and Appellees' *Monell*[4] claims against North Point, because Appellants had not established that Kowalski had violated her students' rights, a pre-requisite of such claims. Further, the district court held that, even if Kowalski had violated her students' rights, Kowalski's supervisors had insufficient notice of Kowalski's actions to be found deliberately indifferent. The district court additionally held that North Point's abuse policies and training were not constitutionally inadequate.

Finding that Appellants' § 1983 claims failed as a matter of law, the district court declined to exercise supplemental jurisdiction over Appellants' state-law claims and dismissed those claims without prejudice. This appeal of the district court's ruling as to Appellants' § 1983 claims followed. We have jurisdiction under 28 U.S.C. § 1291.

## II. ANALYSIS

### A. Standard of review

We review a grant of summary judgment *de novo*, applying the same standard as the district court. *Green Party of Tennessee v. Hargett*, 767 F.3d 533, 542 (6th Cir. 2014) (citing *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011)). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On review of a summary judgment order, all evidence is construed in the light most favorable to the non-moving party. *Villegas v. Metro. Gov't of Nashville,* 709 F.3d 563, 568 (6th Cir. 2013).

---

[4]In *Monell v. Department of Social Services*, the Supreme Court held that 42 U.S.C. § 1983 provides a cause of action against a municipality; however, "[a] plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's policy or custom caused the alleged injury." *Ellis v. Cleveland Municipal Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell v. Dept. of Social Srvs.*, 436 U.S. 658, 690–91 (1978)).

Appellants argue that they adduced evidence demonstrating a genuine dispute of material fact on whether Kowalski violated the students' Fourteenth Amendment substantive due process rights, whether Kowalski's supervisors were deliberately indifferent to these constitutional violations, and whether North Point's policies and procedures created an environment in which Kowalski could abuse her students with impunity, all in contravention of 42 U.S.C. § 1983. We disagree. The Due Process Clause provides protection from the arbitrary actions of government employees, but "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (citation, quotations omitted). As discussed below, while Kowalski's actions were certainly improper, as a matter of law they did not rise to the "egregious" level of unjustified misbehavior that the Fourteenth Amendment proscribes. Therefore, the district court properly granted summary judgment to all Appellees.

## B. Appellants' § 1983 claim against Kowalski

We first address Appellants' claim that Kowalski violated her special-education students' rights to substantive due process. Appellants argue that Kowalski's teaching techniques violated their due process rights to be free from physical abuse at the hands of state actors, and to enjoy personal security and bodily integrity in an educational setting. *See Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) (stating that public school students have the right "to be free of state intrusions into realms of personal privacy and bodily security") (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980)). We address such a claim under our well-established "shocks the conscience" standard. *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996) (stating that "we have no doubt that the 'shocks the conscience' standard is applicable" to a substantive due process claim brought by a public-school student). That is, to raise a material issue of fact as to whether Kowalski violated their rights to personal security and freedom from abuse at the hands of state officials, Appellants must identify conduct that is "so brutal, demeaning, and harmful as literally to shock the conscience . . . ." *Webb*, 828 F.2d at 1158 (quoting *Hall*, 621 F.2d at 613).

We have addressed students' claims of teachers' Fourteenth Amendment violations under the standard first articulated by the Fourth Circuit in its seminal corporal punishment decision,

*Hall v. Tawney*. Under the *Hall* test, the relevant inquiry is "whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking the conscience." *Webb*, 828 F.2d at 1158 (quoting *Hall*, 621 F.2d at 613). These are certainly appropriate considerations for any case, including this one, involving a claim that a teacher violated a student's rights to substantive due process. And in this case, which involves a challenge to educational techniques rather than corporal punishment, it is also particularly important to consider the relationship of Kowalski's allegedly unconstitutional conduct to any legitimate pedagogical purpose.

Therefore, we analyze Appellants' claims under the useful framework developed by the Third Circuit in *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168 (3d Cir. 2001). In *Gottlieb*, the Third Circuit analyzed a student's constitutional claim under the "shocks the conscience" standard by considering the following:

> a) Was there a pedagogical justification for the use of force?; b) Was the force utilized excessive to meet the legitimate objective in this situation?; c) Was the force applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and d) Was there a serious injury?

*Gottlieb*, 272 F.3d at 173. *Gottlieb*, although itself a corporal punishment case, provides a useful, though not necessarily exhaustive, list of factors to balance in evaluating a student's claim that a teacher's educational and disciplinary techniques violated the Fourteenth Amendment. Further, while *Gottlieb* sets out perhaps a more focused inquiry on the "pedagogical justification" motivating a teacher's alleged unconstitutional conduct than *Hall*, it is fully consistent with our precedent applying the "shocks the conscience" standard, as demonstrated below. Therefore, we address each *Gottlieb* factor in turn.

### 1. Pedagogical justification

The relationship of Kowalski's actions to a pedagogical purpose is a particularly important factor to consider in this case, as "conduct intended to injure in some way *unjustifiable by any government interest* is the sort of official action most likely to rise to the conscience-shocking level." *Cty. of Sacramento*, 523 U.S. at 847 (emphasis supplied). The district court

held that Kowalski's legitimate educational goal of toilet-training and legitimate disciplinary goal of maintaining order and focus in her classroom provided a pedagogical justification for her actions. Appellants note that the district court explicitly characterized Kowalski's actions as "child abuse," and argue that child abuse can never be considered "pedagogical." Abuse alone, however, is not the standard at issue on Appellants' due process claims. Rather, the issue is whether the teacher's allegedly unconstitutional conduct is properly "*construed as* an attempt to serve pedagogical objectives." *Gottlieb*, 272 F.3d at 174 (emphasis supplied); *see also Webb*, 828 F.2d at 1158 (distinguishing a principal's non-disciplinary attack on a student outside of school from "*disciplinary* blows, inflicted as punishment for the proper education and discipline of the child"). As stated by the Eleventh Circuit, the "key inquiry is not what form the use of force takes but whether the use of force is related to the student's misconduct at school and for the purposes of discipline." *T.W. v. Sch. Bd. of Seminole Cty., Fla.*, 610 F.3d 588, 598–99 (11th Cir. 2010) (internal quotation marks, brackets, and punctuation omitted).

In other words, the pedagogical purpose factor of the *Gottlieb* test first looks to the ends motivating the teacher's actions and not the means undertaken to achieve those ends. In a case with conduct more offensive than the conduct at issue in this case, for example, the Eleventh Circuit evaluated whether a special-education teacher's patently "abusive behaviors" were capable of being construed as having a disciplinary or educational purpose. *T.W.*, 610 F.3d at 594–96. The teacher in *T.W.* frequently directed profane insults at T.W., an autistic student in her classroom, calling him "lazy, an asshole, a pig, and a jerk." *Id.* at 594. When her insults provoked T.W. into agitation and misbehavior, the teacher—who outweighed T.W. by 150 pounds—acted even more inappropriately by, among other things, yanking T.W. from his chair so that his legs struck his desk, throwing him to the ground face-down, climbing on top of him while pulling his arms or leg behind his back, twisting his arm behind his back, and intentionally tripping him. *Id.* at 595–96. Despite the teacher's obviously abusive behavior, the Eleventh Circuit nevertheless found that her "use of force . . . was related to T.W.'s disruptive or self-injurious conduct and was for the purpose of discipline." *Id.* at 599.

Similarly, in *Flores v. Sch. Bd. of DeSoto Par.*, 116 F. App'x 504, 510–11 (5th Cir. 2004), the Fifth Circuit held that a student failed to state a substantive due process claim against

his coach for shoving the student against a wall, putting the student in a headlock, and insulting the student. The court in *Flores* found that the coach's assault, while improper and possibly tortious, was motivated by the coach's intent to discipline the student for tardiness and insubordination. *Id.* Because the coach "intended to discipline the student for the purpose of maintaining order and respect," the Fifth Circuit affirmed the district court's dismissal of the student's Fourteenth Amendment claim. *Id.; see also D.D. v. Chilton Cty. Bd. of Educ.*, 701 F. Supp. 2d 1236, 1241–42 (M.D. Ala. 2010) (teacher's temporary restraint of a disabled child in a Rifton Chair was a "reasonable response" to the child's "disruptive behavior"); *G.C. v. Sch. Bd. of Seminole Cty., Fla.*, 639 F. Supp. 2d 1295, 1305 (M.D. Fla. 2009) (special-education teacher's acts of striking, grabbing, and restraining a disabled student did not "shock the conscience," because the teacher's restraints were done for "safety purposes").

Taking all facts in the light most favorable to Appellants, Kowalski used inappropriate instructional and disciplinary methods. However, as was the conduct of the special-education teacher whose inappropriate techniques were examined by the Eleventh Circuit in *T.W.*, Kowalski's educational and disciplinary techniques, though certainly questionable, were utilized for a proper educational purpose. In fact, the record here establishes that Kowalski's conduct was, if anything, much more closely related to a legitimate pedagogical purpose than the obviously "abusive behaviors" exhibited by the *T.W.* teacher. Kowalski's complained-of conduct involved attempts, albeit misguided ones, to address her special-education students' undisputed educational or disciplinary needs. J.J., for example, was not toilet-trained, struggled with balance, and would soil herself unless she had some assistance in using the bathroom. In fact, J.J.'s individualized education plan included toilet-training as one of her educational goals. Kowalski attempted to assist J.J. in meeting her goal of safely and properly using the toilet by securing J.J. to the toilet with a belt. N.D., as J.J., also was not toilet-trained, and Kowalski attempted to meet N.D.'s needs by placing her on a training-toilet in the classroom. While this was certainly offensive to N.D.'s dignity, Kowalski's undisputed motivation was to assist N.D.—who would become highly agitated at the slightest change in routine—to relax and properly use the toilet, and not to humiliate or punish her. Similarly, Kowalski's attention-focusing techniques of squeezing students' faces and pushing their heads down onto their folded

arms were, in Brant's own words, applied only in situations where "the children weren't staying on task . . . or focusing."

Finally, Kowalski's one-time restraint of R.G. also is properly construed as related to a legitimate pedagogical objective. R.G. frequently required training in addressing numerous misbehaviors, including tripping and pushing others, spitting at teachers or other students, throwing tantrums, and screaming. On the one occasion that Brant found R.G. "bound and gagged"[5] in the church hallway, R.G. had been spitting and scratching at himself, and refusing to stop despite Kowalski's multiple verbal requests. Kowalski testified that she "needed to be firm" to help R.G. to correct this misbehavior. Taking Brant's claim that Kowalski strapped R.G. to a gurney and bound his mouth as true, the record establishes that Kowalski used this unorthodox method to stop R.G. from spitting, and to address his disruptive and defiant behavior in class. Indeed, Brant acknowledged that Kowalski had restrained R.G. to correct his behavior, rather than to harm or humiliate him. Therefore, while Kowalski's restraint of R.G. was insensitive and improper, we nevertheless find that Kowalski had a legitimate educational purpose—addressing R.G.'s misbehavior.

In finding that Kowalski's actions clearly served a legitimate, identifiable pedagogical purpose, we do not pass judgment on the advisability of these interventions as special-education practices. Indeed, based on the testimony of Appellants' expert, Dr. Helen Malone, Kowalski's methods were improper and counterproductive. However, special-education professional standards are not the relevant consideration in an analysis of whether a teacher's conduct violated the Fourteenth Amendment. As the Eleventh Circuit stated in *T.W.*, "we do not express any judgment as to the desirability of corporal punishment as a policy matter. Instead, we look at the circumstances surrounding [the] use of force to determine whether the force is 'capable of being construed as an attempt to serve pedagogical objectives.'" *T.W.*, 610 F.3d at 599 (quoting *Gottlieb*, 272 F.3d at 174). Here, the surrounding circumstances indicate a clear educational or

---

[5]As previously stated, Kowalski denied Brant's claim that she "bound and gagged" R.G. on a gurney, and claimed that she had merely covered his mouth for long enough to tell him to stop spitting. However, as Plaintiffs are the parties defending summary judgment, we view all evidence in the light most favorable to them, and accept Brant's version of events as true. *See Ruffin-Steinback v. dePasse*, 267 F.3d 457, 461 (6th Cir. 2001) (citation omitted).

disciplinary motive for each of Kowalski's allegedly unconstitutional acts, and therefore this factor weighs in Kowalski's favor.

## 2. Excessiveness

Having established that Kowalski's actions were related to pedagogical goals, we next examine whether her techniques were excessive with respect to those goals. *See Gottlieb*, 272 F.3d at 173. We have made clear that, when a teacher's allegedly unconstitutional conduct was motivated by a legitimate educational or disciplinary goal, the conduct must be clearly extreme and disproportionate to the need presented to be excessive in the constitutional sense. In *Saylor v. Bd. of Educ. of Harlan Cty., Ky.*, 118 F.3d 507, 511 (6th Cir. 1997), for example, a teacher paddled an eighth grade student so hard that it knocked the breath from the student, and left visible bruises and swelling on the student. Despite the teacher's admission in retrospect that the use of force in the paddling "was excessive," we nevertheless held that it was not "so severe" or "disproportionate to the need presented" that it violated the Fourteenth Amendment. *Id.* at 515 (quoting *Ingraham v. Wright*, 525 F.2d 909, 916 (5th Cir. 1976)). Indeed, even in a case where a teacher slapped a student with no pedagogical purpose whatsoever, we held that the single slap was not unconstitutionally excessive, because it "was neither severe in force nor administered repeatedly." *Lillard*, 76 F.3d at 726.

Here, as well, Appellants have presented no evidence that Kowalski's educational and disciplinary methods were "severe in force," or otherwise constituted a "brutal and inhumane" abuse of power. As to Kowalski's toilet-training of J.J. and N.D., for example, the force that Kowalski applied—if she applied any force at all—was no more than arguably necessary to keep these students safely on their toilets. Further, the force that Kowalski applied in squeezing her students' faces, or pushing the students' heads down onto their folded arms, was minimal, and therefore not excessive. The use of force that Kowalski applied in restraining R.G. also was not unconstitutionally excessive, as it occurred a single time, and for only the duration intended to correct R.G.'s spitting and disruptive behavior. *See Lillard*, 76 F.3d at 726.

### 3. Intent

In evaluating the third factor in *Gottlieb*'s framework, we consider whether Kowalski acted "in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm[.]" *Gottlieb*, 272 F.3d at 174. This factor focuses our attention on "what animated [Kowalski's] action or [her] intent in acting." *Id.* Absent direct evidence of a malicious intent, courts look to the surrounding circumstances to determine whether a school official's conduct was undertaken in a good-faith effort to educate, train, or maintain discipline, or for the purpose of causing harm. In *Gottlieb*, for example, a teacher physically pushed a student without a legitimate educational or disciplinary purpose. The Third Circuit, however, concluded that "[t]he push itself was so minor that even if the injuries she alleges occurred, it cannot be inferred from the act itself that Carbonara intended to act maliciously and sadistically so as to constitute a constitutional violation. . . . Thus, Carbonara's conduct, although possibly tortious, does not give Gottlieb a constitutional cause of action." *Id.* at 175.

The Fourth Circuit's decision in *H.H. v. Moffett*, 335 F. App'x 306 (4th Cir. 2009), is instructive in its contrast to the lack of evidence of malice and sadism presented by Appellants in this case. In *H.H.*, a disabled child's mother became concerned because, after her child enrolled in a new special-education class, the child exhibited growing distress and suffered from increasingly regular "grand mal" seizures. *Id.* at 307–09. The child's mother attached a recording device to the child's wheelchair, which recorded teachers insulting the child, cursing at her, conspiring to prevent her from receiving necessary educational services, and keeping her restrained in her wheelchair for hours at a time. *Id.* at 309. The Fourth Circuit held that the objective evidence of the teachers' open hostility to the child proved that their abusive conduct had no valid purpose; instead, it was motivated by malice, callousness, and deliberate indifference to the child's rights. *Id.* at 313.

Here, by contrast, Appellants have provided no direct evidence that Kowalski's actions were motivated by malice, callousness, or deliberate indifference. Appellants have offered no evidence that Kowalski regularly berated or insulted her special-education students, conspired to keep them from receiving necessary services, or punished them without any legitimate reason for doing so. Nor may an improper purpose be inferred simply from the challenged acts themselves.

Indeed, the facts reveal that Kowalski's purpose, in most instances, was to assist her students in meeting their educational goals, and in the others, to curb disruptive behavior. The mere fact that Kowalski did not use good or even acceptable practices to accomplish these goals is simply insufficient to raise an inference that she undertook these practices with a malicious or sadistic intent.

### 4. Injury

The final *Gottlieb* factor directs a court to consider whether any Appellant suffered a "serious injury." *Gottlieb*, 272 F.3d at 173. Appellees contend that Appellants' constitutional claims fail outright under this factor, based on Appellants' failure to adduce evidence of a serious physical injury. Appellees posit that psychological injury alone is insufficient as a matter of law to prove that a plaintiff suffered a violation of her right to substantive due process. Appellees' proposition that we pose an absolute requirement of physical injury for substantive due process claims is misplaced. While we have never explicitly addressed whether a Fourteenth Amendment substantive due process claim must be substantiated with evidence of a serious physical injury, as opposed to a serious psychological injury, our precedent shows that we impose no such bright-line requirement.

In *Webb*, for example, we determined that a student's claim that her principal physically attacked her off school grounds was sufficient to raise a triable issue on the student's substantive due process claim, without any discussion of the seriousness of the student's injury. 828 F.2d at 1159. Also, in *Nolan v. Memphis City Schs.*, 589 F.3d 257 (6th Cir. 2009), we noted that the student—in addition to sustaining no dramatic *physical* injuries—"also produced scant evidence of significant *psychological* injury stemming from the paddling." *Id.* at 269–70 (emphasis supplied). Other circuits have more explicitly refused to enact a bright-line rule requiring that a student bringing a substantive due process claim must demonstrate a serious physical, as opposed to psychological, injury. *See T.W.*, 610 F.3d at 601–02 ("[W]e can imagine a case where an exercise of corporal punishment—even one that causes only psychological injury—" might support a due process violation); *Abeyta v. Chama Valley Indep. Sch. Dist., No. 19,* 77 F.3d 1253, 1257-58 (10th Cir. 1996) ("We are unwilling to hold that actions which inflict only psychological damage may never achieve the high level of 'a brutal and inhuman abuse of

official power literally shocking to the conscience'" (citation omitted)); *White v. Rochford*, 592 F.2d 381, 385 (7th Cir. 1979) ("[W]e nonetheless feel that the protections of the Due Process Clause against arbitrary intrusions on personal security include[] both physical and emotional well-being.").

We, too, can imagine a case in which evidence of serious psychological injury could support a Fourteenth Amendment substantive due process claim. However, that is not the case here. Appellants have presented no evidence of any serious injury, physical or otherwise. Appellants contend that our decision in *Webb*, which did not provide a detailed discussion of the plaintiff's injury, and focused instead on the maliciousness and egregiousness of the school official's conduct, indicates that they may survive summary judgment without presenting proof of any injury. *Webb*, however, examined a case in which a school principal physically assaulted a student, off school grounds, with no readily apparent educational or disciplinary goal. *See Webb*, 828 F.2d at 1154. Indeed, we stated explicitly in *Webb* that the facts of that case gave no indication that "the blows arose other than in anger or from malice." *Id.* at 1158; *see also Saylor*, 118 F.3d at 514 ("*Webb* is not directly on point here, because it involved a battery that was in no way 'disciplinary'—and we stressed the importance of distinguishing the type of battery at issue in *Webb* from the disciplinary blows inflicted as punishment in *Ingraham*."). Here, by contrast, Kowalski's allegedly unconstitutional conduct, in addition to resulting in no demonstrated serious injury, occurred in the classroom context, and was related to legitimate pedagogical goals.

5.

Kowalski's educational and disciplinary methods, as reported by Brant, may have been inappropriate, insensitive, and even tortious. This does not, however, render them unconstitutional. As we stated in *Lillard* and *Webb*, "the substantive due process claim is quite different than a claim of assault and battery under state tort law . . . ." *Lillard*, 76 F.3d at 725 (quoting *Webb*, 828 F.2d at 1158); *see also Lewis*, 523 U.S. at 848 (The Due Process Clause does not impose liability "whenever someone cloaked with state authority causes harm."). The evidence establishes that Kowalski attempted to toilet-train and control her special-education students in furtherance of valid pedagogical goals. The methods she employed to accomplish

these goals do not shock the conscience. Moreover, Appellants produced no evidence that Kowalski acted out of malice, callousness, or deliberate indifference. Appellants also produced no evidence that any student suffered a serious physical or psychological injury. Therefore, the district court did not err in granting summary judgment to Kowalski on Appellants' substantive due process claims.

### C. Appellants' § 1983 claims against North Point and Kowalski's supervisors

Because we find that Kowalski's conduct did not rise to the conscience-shocking level required of a Fourteenth Amendment substantive due process claim, there is no basis for holding her supervisors or school district liable. *See McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470–71 (6th Cir. 2006) (noting that a prerequisite of supervisory and *Monell* liability under § 1983 is unconstitutional conduct by a municipal employee).

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**CONCURRING IN PART AND CONCURRING IN THE JUDGMENT**

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and concurring in the judgment. I agree with much of Judge Huck's thoughtful opinion. I write separately because I agree with the partial dissent that if R.G. was bound and gagged as Brant claims, that was a grossly disproportionate response to his spitting, and because I agree that a reasonable jury could infer from that evidence that Kowalski acted with malice.

And while I also agree with the dissent that, in assessing the injury requirement, this court should consider the peculiar difficulties faced by children such as R.G. who are non-verbal and severely disabled, I nevertheless concur in the judgment because there is simply no evidence of *any* injury in this case. Nor, as the district court rightly noted, is there evidence of distress or anxiety that might imply injury. *Cf. H.H. ex rel. H.F. v. Moffett*, 335 F. App'x 306, 308 (4th Cir. 2009) ("H.F. began to notice that her daughter[, who had limited verbal capacity,] was becoming increasingly distressed, anxious, and angry about her experiences [at school]."). In fact, the record does not contain a single complaint by any parent.

The lack of injury is dispositive. And I accordingly concur in part and concur in the judgment.

---

**DISSENTING IN PART**

---

BOGGS, Circuit Judge, dissenting in part.   I concur in the majority's well-reasoned opinion with respect to the claims of N.D. and J.J.  However, I dissent with respect to dismissing R.G.'s claim on summary judgment.

Cases involving teacher action with respect to severely disabled or disturbed students can be very difficult, as it is undoubtedly true that measures may need to be taken that are quite different from those in a conventional classroom.  The majority opinion generally sets out these difficulties well and applies them to several of the appellants.  However, with respect to R.G., I cannot say that there is no genuine issue of material fact as to the objective reasonableness of the teacher's actions in binding and gagging him.

First, I think that in the application of the *Gottlieb* factors, 272 F.3d at 173, the court's emphasis on actions that are "capable of being construed" as serving a pedagogical objective distracts from what should be the focus of the inquiry: actions that in fact do serve such objectives.  The *Gottlieb* court's language makes clear, as would the grammar of the sentence, that being "capable of being construed" as serving pedagogical objectives is merely a necessary condition to create a factor pointing against summary judgment, but not a completely sufficient one.  Many things that might be capable of being construed in a certain way are also subject to genuine dispute, and on summary judgment that genuine dispute cannot be discounted.

In this case, although R.G. was certainly disruptive and his spitting was troubling, the teacher's action in binding him to a gurney and gagging him with a bandana could be found by a reasonable jury to shock the conscience.  At this stage we are not empowered to decide either that the action was or was not shocking on these facts, but merely whether there is a genuine issue.

I would point to the factors that a reasonable jury might rely on:  this particular discipline was never repeated, although R.G. acted in this manner on several occasions; the actions were the subject of severe criticism by a teacher's aide; and if there were no legitimate pedagogical

necessity for this action, then the significant degree of force employed could be taken by a reasonable jury to be malicious or sadistic.

Finally, I would note that the fourth *Gottlieb* factor, whether a "serious injury" occurred, may need to be assessed in light of the particular problems of a non-verbal severely disabled child. The fact that a child may have difficulty in expressing emotional disturbance from such treatment would counsel in favor of greater latitude, not less, in consideration of that factor. Otherwise the result is lessened protections, rather than "heightened protections for disabled pupils" as referenced in numerous decisions. *Preschooler II v. Clark Cty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1182 (9th Cir. 2007); *see also Sagan v. Sumner Cty. Bd. of Educ.*, 726 F. Supp. 2d 868, 885 (M.D. Tenn. 2010) (noting that an educator's constitutional responsibility to special-needs students is "inevitably heightened"); *M.S. ex rel. Soltys v. Seminole Cty. Sch. Bd.*, 636 F. Supp. 2d 1317, 1323 (M.D. Fla. 2009) ("The conscience-shocking threshold is more quickly reached in cases where the victim is particularly vulnerable to abuse and is otherwise defenseless.").

In addition, we have not rigidly treated the existence of a serious injury as a mandatory requirement, but rather as evidence that force was excessive. *See, e.g., McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (denying qualified immunity even though victim "may not have suffered a 'serious or permanent injury' as a result of the alleged blows . . . [since] there was clearly no need for the[ blows]"); *Webb v. McCullough*, 828 F.2d 1151, 1158–59 (6th Cir. 1987) (denying qualified immunity when victim produced no evidence of serious physical injury because a trier of fact could have found "that the alleged blows were a brutal and inhumane abuse of . . . official power").

Although this case is difficult, I think the balance of factors should preclude granting summary judgment against R.G.'s claim and should rather allow that claim to go to a factfinder. I therefore respectfully dissent with respect to that portion of the majority opinion.