DISSENT
CLAY, Circuit Judge,
dissenting.
If you read only the majority opinion, you would think that this is an open and shut case. But here is what the majority downplays or leaves out completely. J.G., like several other of Sharon Turbiak’s disabled students — the ones she treated “like animals” (R. 206-2, Schultz Report, Pa-gelD# 8144) — had a target on their backs. The things that happened to them — being force-fed while crying and gagging, being screamed at in their faces, being violently grabbed and pushed to the ground, being put in restraints made of potato" chip cans, having their chairs pulled out from under them, or being otherwise humiliated and treated like something less than human— happened for the simple reason that Turb-iak liked “to target lower functioning students.” (Id. at 8143.) After all, Turbiak had, as she put it, “a sick sense of humor.” (Id. at 8136.)
Despite this, and despite the fact that none of these things happened to students without disabilities, the majority has decided that Lauren Gohl’s claims under the Americans with Disabilities Act (“ADA”), 42 U.S.C. §§ 12101-12213, and the Rehabilitation Act, 29 U.S.C. § 701 et seq., should not go to the jury. At the same time, the majority rejects the possibility that a jury could reasonably find that J.G. suffered adverse educational effects as a result of Turbiak’s abuse. But the majority does not *686 stop there. It goes on to state that no jury could find excessive force when a special education teacher grabs a severely brain injured three-year-old child by the head and violently jerks it back.
All told, the majority’s approach to this case — from ignoring some of the most important facts, to drawing inferences in favor of the wrong party — would make it almost impossible for a plaintiff in a disability discrimination case to get her case to the jury. And getting to a jury should be nowhere near as difficult as the majority makes it; all a plaintiff should need to do is present enough evidence to create a genuine issue of material fact for each of her claims. Since Gohl has done exactly that, summary judgment should never have been granted. This case should therefore be reversed and remanded.
I.
The majority does not tell the full story. For one, J.G.’s medical condition is far more serious than the majority lets on. His disability, a brain condition called hydrocephalus, is characterized as “severe” and J.G. himself is described as being “medically fragile.” (R. 127-9, Student Services Report, PagelD# 1815; R. 177-7, Respon-dek Deposition, PagelD# 3977.) J.G. has undergone several surgeries to his head, including having a. retroperitoneal shunt implanted in his brain. As a result, any severe head movement could be life threatening to him. Because of the seriousness of J.G.’s condition, his mother, Gohl, made sure Turbiak knew “that [J.G.’s] head area was very fragile” when she enrolled him in Turbiak’s classroom at Webster Elementary School. (R. 179-9, Respondek Deposition, PagelD# 4449.)
The majority also downplays the extent of concern over Turbiak’s classroom behavior. Beginning in October 2011, approximately two months into J.G.’s school year, various school employees began making complaints about Turbiak to Shellie Moore, Webster Elementary School’s principal. Beth Santer, a specialist in the school’s Moderate Cognitive Impairment Program, told Moore that several employees were concerned about the climate of Turbiak’s classroom, pointing out that Turbiak “was harsh to students ... [and] yelled loudly in their faces.” (R. 184-9, Moore’s Timeline of Events, PagelD# 6212.) Another employee, Tracey Crews, reported similar behavior by Turbiak: “[she was] being harsh with children, holding their faces or chins tightly and yelling in their faces.” (Id.)
Other employees reported that Turbiak was not only verbally abusive, but physically abusive as well. Meagan Sprow told Moore that “when [Turbiak] placed children in time out ... she used too much force by pushing on children’s shoulders.” (Id.) Sprow also said that when it came to children with mobility issues, Turbiak “had a pattern of letting them fall rather than to support their transition to a chair or the floor.” (Id.) Candy Sokol, who was assigned to Turbiak’s classroom to work as a paraprofessional, called Moore in tears because she thought Turbiak’s behavior was “escalating.” (Id.) Moore described her conversation with Sokol in the following way:
[Sokol] stated that she was afraid that Mrs. Turbiak was escalating and that she had said something to the effect that she (Mrs. Turbiak) thought it was a good thing that [the] administration believed she had a warm and nurturing classroom and didn’t know that they hit kids around in the classroom. This type of humor upset [Sokol] I believe because she feels that children are treated roughly in the [class]room.
(Id. (parenthesis in .original).)
A different employee, Carol DeBeaudry, reported an incident where Turbiak force-fed cereal to one of her disabled students *687 while that student cried and gagged. De-Beaudry reported another incident where “children were picked up from the floor by one arm ... [causing] the potential to dislocate a small shoulder.” (Id.) As De-Beaudry observed, “Turbiak appeared more harsh and abrupt with the lower functioning students.” (Id.)
On October 31, 2011, several days after receiving these complaints, Moore approached Cynthia DeMan, the Livonia Public School District’s director of personnel, to report what had happened. DeMan advised Moore to speak directly with Turbiak, which Moore then did. During the one and a half hour meeting between Turbiak and Moore, Turbiak cried off and on while explaining that she was “stressed out because of the level of disability of her students and the reduction of support.” (Id. at 6213.) Turbiak acknowledged that she could be “loud and abrupt” with her students, but insisted that it was for their own good. (Id.) Turbiak said that she would change the way she did things in her classroom and that she “wouldn’t be touching any child.” (Id.) But Moore advised otherwise: “I told her that I thought rather than institute sudden changes in the routine in her classroom, that she take a few days to process this information and that I would support her as the year continued. I hugged [her] as she was leaving my office.” (Id.)
Moore also told Turbiak not to question her colleagues about who had reported these incidents, but Turbiak did not listen. The day after her meeting with Moore, Turbiak called a meeting with several members of her classroom team to find out who reported her. She told her team that she could no longer trust anyone, and threatened that “she was going to do everything in her power to find out who had spoken to [Moore].” (Id.) She also threatened that she would question each person on her team “until someone grew the balls” to come forward. (Id.) Towards the end of the meeting, though, Turbiak assured her team that “she will no longer touch/put [her] hands on [J.G.].” (R. 129-19, Schultz Report, PagelD# 2137.) Turb-iak’s meeting only made things worse, as members of Turbiak’s team went back to Moore, this time expressing fears of retaliation.
The majority also fails to mention the school district’s hardly doing anything about Turbiak’s behavior. Although De-Man (the district’s personnel director), met with Turbiak and her union representative a few days after being approached by Moore, the meeting was mainly held to discuss Turbiak’s relations with her colleagues, rather than her behavior towards students. DeMan made a number of recommendations for how Turbiak could “re-stor[e] a solid working relationship” at Webster Elementary School, but none of these recommendations addressed the allegations of physical abuse by Turbiak against her students. (R. 179-27, DeMan Memorandum, PagelD# 4633-34.) And while DeMan did tell Randy Liepa, the district’s superintendent, that there was a “situation” involving Turbiak, all Liepa said was that he wanted to be kept informed. (R. 177-3, DeMan Deposition, Pa-gelD# 3893-97.)
The next notable development occurred in March 2012, when Sokol was told by Santer that there' were weekly complaints against Turbiak. Then, on March 5, 2012, Diane Sloboda, a social worker at Webster Elementary School, walked into Turbiak’s classroom as Turbiak was grabbing J.G. by the head, jerking it back, and yelling in his face. Sloboda later described what she saw in a letter to Moore:
At around 9:30 a.m.[,] I opened the preschool classroom door and entered the room looking for our psychologist. Once inside I saw [Turbiak] grab [J.G.] by the *688 top of his head and jerk it back quite aggressively. She also yelled[,] “You need to listen” very close to his face. After the incident she realized I was watching and quietly went back to assisting another student. A paraprofessional was also in the room although I am uncertain of whether or not she saw what had happened.
I realize we all may have moments of frustration when working with special needs children. However, I feel it is extremely important to have a personal plan that will allow someone a way to express those feelings appropriately and not take them out on the students.
(R. 177-26, Sloboda’s Statement, Pa-gelD# 4143.)
After hearing what had happened from Sloboda, Moore called the school district’s administrative office and spoke with either DeMan or Dorothy Chomicz, a co-director of human resources. Moore was told to “[s]end [Turbiak] over.” (R. 179-6, DeMan Deposition, PagelD# 4352.)
Turbiak and her union representative met with DeMan and Chomicz to discuss what Sloboda had reported seeing. Turbiak denied grabbing J.G. by the head or yelling in his face; rather, she said she was using a technique called “redirecting,” in order to “keep [J.G.’s] head ... from bouncing around” after she saw him throw a toy. (Id. at 4353.) Because Chomicz thought Turbiak did nothing improper, she sent Turbiak back to her classroom:
After discussing what we had heard and what we heard from Shellie Moore and what we read and our — my discussion with [Chomicz], who is a — also a special education] teacher, that’s one of her certifications, and she talked about redirecting and this is what you do sometimes and she sent her back.
(Id. at 4352.)
Just a few weeks later, on March 20, 2012, Turbiak was at it again. This time, Sokol, the paraprofessional assigned to Turbiak’s classroom, was in Turbiak’s classroom along with Turbiak, DeBeaudry, and Nancy Respondek, another paraprofessional. While they were all in the classroom together, a special needs student named Cayden flipped over a table. Turb-iak and Respondek waited for DeBeaudry to leave the classroom. Once DeBeaudry left the room, Turbiak announced, “[s]he’s gone.” (R. 206-14, Sokol Deposition, Pa-gelD# 8380.) Respondek then walked over to where Cayden was, grabbed him by the arm, spanked him, and yelled into his face. When Sokol tried to intervene, Turbiak told her that she was “being too nice and needed to yell.” (Id. at 8382.) Two days later, Sokol reported what had happened to Moore.
II.
Notably absent from the majority’s opinion is any mention of the thirty-one page report prepared by Mark Schultz, the school district’s safety officer, which describes a number of things Turbiak did to her special needs students. (R. 206-2 at 8132.) Schultz, who questioned Moore about why she had not contacted child protective services, learned about the following series of events through his investigation of Turbiak:
• Turbiak would restrain children in various ways. Sokol described one of those incidents this way: “[Turbiak] placed [a student named Hayden] into the bathroom for time out. Hayden is confined to a wheel chair. This occurred numerous times and he was left unattended.” (Id. at 8136.) Turbiak would also “use trays ... as physical restraints in the classroom,” and one time put “potato chip cans coated in a soft material over [another student’s] arms so that [the student] could not *689 cover her ears or get her hands to her face.” (Id. at 8144.) ■
• Turbiak pulled a chair from beneath one of her preschool students as that student was sitting down, and when that student fell, Turbiak laughed and blurted out, “I have a sick sense of humor.” (Id. at 8136.)
• Another employee reported that Turb-iak “would repeatedly grab and forcefully slam students into time out. Time out was never a gentle discipline.” (Id. at 8144.)
• One time, Sprow watched Turbiak “say to a staff member ‘watch this’ and then yell ‘no’ and laugh when [an] auditory defensive student ... would cover her ears and start crying.” (Id. at 8143-44.)
• Sprow also reported to Schultz that Turbiak “was rough” with her students and acted “outside the boundaries.” (Id. at 8146.) Sprow recalled one incident where Turbiak pushed a student down. (Id.)
• While holding the hand of a student named Makayla, Turbiak let go of Ma-kayla’s hand so that Makayla would fall to the floor; and then Turbiak would laugh once Makayla actually fell. (Id. at 8143.)
• Turbiak seemed to especially pick on Makayla; she once force-fed Makayla while she cried and yelled. (Id.)
• Another time, Turbiak slapped Makay-la’s hand and then turned to Sprow, who witnessed that incident, and, said, “you didn’t see that.” (Id.)
When describing some of these incidents, Sprow told Schultz that Turbiak “tends to target lower functioning students to be more physical and to yell at them.” (Id.) Sprow also told Schultz that Turbiak “does not treat [special education] students with compassion or integrity.” (Id. at 8144.) Instead, Sprow said, Turbiak “treats them like animals.” (Id.)
Schultz also learned from Turbiak’s coworkers that Turbiak tried to hide what she was doing. Turbiak would tell her coworkers that “what happens in preschool stays in preschool,” and once said to one of her co-workers: “It’s a good thing I do nice things for the parents, that way they don’t hate me when I smack their kid around.” (Id. at 8145, 8136.)
As a result of Schultz’s investigation, Liepa, the district superintendent, recommended to the district’s board of education that Turbiak be terminated. Liepa’s June 12, 2012 letter to the board referenced a number of specific incidents concerning Turbiak’s adverse treatment of disabled students, and concluded with the following:
Ms. Turbiak’s behavior, taken individually or collectively, represents a violation of law and Board policy, constitutes a serious breach of her duties and obligations to the School District and its staff and students, displays a disregard for the special responsibilities of an educator, has had an adverse effect upon the School District, its staff and its students, and is inconsistent with the values the School District is attempting to teach.
(R. 189-3, Liepa Letter, PagelD# 7271.)
Turbiak was ultimately fired by the school district. On June 13, 2012, the district also terminated Respondek for “inflict[ing] corporal punishment on a preschool, special education student,” and also for failing to report abuse. (R. 189-4, Res-pondek Termination Letter, Pa-gelD# 7273.) Several months later, in September 2012, the district issued written discipline to several other employees for failing to report abuse.
III.
Simply put, the district court should not have granted summary judgment to Defendants on all of Gohl’s claims, and should *690 have permitted this case to proceed to trial. To move past summary judgment, all that Gohl needed to do was to introduce enough evidence to create a genuine issue of material fact on each of her claims. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R. Civ. P. 56(a). And the evidence in this case — especially when viewed in a light most favorable to Gohl (the non-moving party), as we are required to do, see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) — shows that Gohl did exactly that.

A. Gohl’s ADA and Rehabilitation Act Claims

The district court’s first error, which the majority looks past, was dismissing Gohl’s claims against the Livonia Public School District under the ADA, 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. The district court, after holding a three-day summary judgment hearing, concluded that there was no genuine factual dispute as to whether J.G. was excluded from participation in, denied the benefits of, or subjected to discrimination under his school district’s educational program because of his disability.
Title II of the ADA provides that “no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.” 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act likewise provides that “[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance];.]” 29 U.S.C. § 794(a).
“Apart from § 504’s limitation to denials of benefits ‘solely’ by reason of disability and its reach of only federally funded — as opposed to ‘public’ — entities, the reach and requirements of both statutes are precisely the same.” S.S. v. E. Ky. Univ., 532 F.3d 445, 452-53 (6th Cir. 2008) (internal brackets, quotation marks, and citation omitted). As this Court has put it, “the ADA and Rehabilitation Act cover largely the same ground.” R.K. ex rel. J.K. v. Bd. of Educ. of Scott Cty., Ky., 637 Fed.Appx. 922, 924 (6th Cir. 2016). Therefore, as the majority alludes to, this Court analyzes the two claims together. See S.S., 532 F.3d at 452-53; see also Thompson v. Williamson Cty., 219 F.3d 555, 557 n. 3 (6th Cir. 2000) (explaining that the plaintiffs ADA and § 504 claims may be analyzed together).
In order to prevail in her ADA and Rehabilitation Act claims against the school district, Gohl has to establish that J.G. is “(1) disabled under the statute, (2) ‘otherwise qualified’ for participation in the program, and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under the program by reason of his ... disability.” S.S., 532 F.3d at 453 (citation omitted). Under the third factor, Gohl needs to show that the school district treated similarly situated, non-disabled students better than it treated J.G. Int’l Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); Shah v. General Electric Co., 816 F.2d 264, 268 (6th Cir. 1987) (“[I]ndividual disparate treatment ... cases generally require indirect evidence from which an inference of discriminatory motive may be drawn, namely, comparative evidence demonstrating that the treatment of the plaintiff differs from that accorded to otherwise similarly situated individuals who are not within the plaintiffs protected group.” (internal quotation marks and citation omitted) (ellipses in original)).
*691 Both the ADA and Rehabilitation Act require a plaintiff, like Gohl, to show “that the defendant took action because of the plaintiffs disability, i.e., the plaintiff must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.” Anderson v. City of Blue Ash, 798 F.3d 338, 357 (6th Cir. 2015) (internal quotation marks, brackets, and citations omitted) (emphasis added); see also Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 317 (6th Cir. 2012) (en banc).
Once a plaintiff makes out a prima facie case of discrimination, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for its adverse action. Anderson, 798 F.3d at 357. “If the defendant does so — and its burden is merely one of production, not persuasion — the plaintiff must then present evidence allowing a jury to find that the defendant’s explanation is a pretext for unlawful discrimination.” Id. (internal quotation marks, brackets, and citation omitted).
It is undisputed that J.G. is a qualified individual with a disability. The only dispute below, and on appeal, is the third element for an ADA or Rehabilitation Act claim, i.e., whether J.G. was excluded from participation in, denied the benefits of, or subjected to discrimination under his school district’s educational program because of his disability.
The majority thinks that Gohl’s entire case comes down to whether J.G. made progress on his individualized education program (“IEP”) goals. Essentially, what the majority opinion is saying is that because J.G. made progress on his IEP goals, Gohl cannot show that he was deprived of an educational benefit. See Maj. Opn. at 681-82. The district court said the same thing as its basis for dismissing Gohl’s ADA and Rehabilitation Act claims. See Gohl v. Livonia Pub. Sch., 134 F.Supp.3d 1066, 1076 (E.D. Mich. 2015) (“J.G.’s IEP goals provide some fairly specific benchmarks, such as improving work habits, developing feeding and eating skills, developing perceptual discrimination and conceptual skills, and demonstrating emerging language skills. However, Plaintiff points to no evidence that J.G. was blocked from meeting any one of those specific goals. To the contrary, the record evidence confirms progress in meeting those goals.”) (internal quotation marks and citations omitted).
By trying to frame the inquiry as one involving whether J.G. made progress on his IEP goals, the majority takes much too narrow a view of the evidence. What the majority fails to appreciate is that the inquiry here, ie., whether J.G. was denied the benefits of his special education program, is broader than it is narrow. The district court made the same error. When it considered whether J.G. was denied the benefits of his special education program, the district court should have looked to the entire record, and not just to evidence that J.G. purportedly made some progress on his IEP goals. By failing to do so, the district court ignored most of the record and disregarded other evidence favorable to Gohl. See, e.g., Bomar v. City of Pontiac, 643 F.3d 458, 462 (6th Cir. 2011) (“The facts as alleged by the plaintiff are not simply the facts that can be gleaned from the plaintiffs deposition testimony, but are rather the facts in the entire record, interpreted in the light most favorable to the plaintiff.”) (Boggs, J., writing for the majority). But since this Court’s review is de novo and it independently reviews the record, see Tysinger v. Police Dep’t of Zanesville, 463 F.3d 569, 572 (6th Cir. 2006), it does not matter for our review that the district court failed to consider the entire record — and the majority should not have *692 been influenced by the district court’s error.
There is, quite simply, another way to look at this case. What the district court should have focused on is all the evidence that Turbiak had created an abusive environment in the school district’s special education program — one where her students either witnessed or were the targets of abuse at the hands of someone who was supposed to protect them. And a reasonable, even compelling, inference from the record is that Turbiak’s abuse inhibited disabled children like J.G. from being educated appropriately.
Although Defendants refute this by' pointing to J.G.’s academic progress, it is for the jury, not the court, to accept or reject Gohl’s argument. A jury could, for example, conclude from the evidence that even if J.G. was not denied all educational benefit, he was still subjected to an impaired educational environment and suffered adverse educational effects as a result of Turbiak’s abuse. A jury could find that J.G. achieved some educational gains despite the abuse, and yet conclude that he was nonetheless seriously hindered in his development, as evidenced by the way he behaved at home. See R. 209-5, Gohl Deposition, PagelD# 8544-45 (Gohl testifying that after she pulled J.G. out of Turbiak’s classroom, J.G.’s “behavior was like a totally different person,” as he was displaying signs of “[ajnxiety, opening and closing anything and everything, having things done a certain way or panic, panic.”). And this would be a perfectly reasonable conclusion, as even the government’s experts in the field have written that “[hjarassment of a student based on disability may decrease the student’s ability to benefit from his or her education.” Reminder of Responsibilities under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act, U.S. Dep’t of Educ. (July 25, 2000), http://www 2.ed.gov/about/offices/list/ocr/docs/ disabharassltr.html.
The point here is that a student can grow academically and still be denied the educational benefits that a school is supposed to provide. The two are not mutually exclusive. The purpose of the Livonia Public School District’s special education program was to enable students with disabilities to achieve their highest performance possible, and we may never know the extent to which J.G.’s growth was impeded as a result of Turbiak’s mistreatment. A jury should be permitted to decide whether being in an environment free of abuse and mistreatment would have enhanced J.G.’s progress, and there is certainly enough evidence in the record for a jury to make that determination.
There is, however, an even stronger reason why summary judgment should never have been granted in this case: the record is filled with evidence suggesting that J.G. was subjected to discrimination because of his disability. The majority opinion states that “[t]he record does not contain any direct evidence, no smoking gun as it were, that Turbiak or other school officials intentionally mistreated disabled students because they were disabled.” Maj. Opn. at 683. And that is just completely belied by the evidence.
The record is full of disgusting things that Turbiak did to her disabled students, the ones she treated “like animals.” (R. 206-2 at 8144.) She force-fed them as they cried and gagged; screamed in their faces; let children with mobility problems fall to the floor; grabbed and pushed them to the ground; put them in restraints made of potato chip cans; confined them to the school’s bathroom; pulled their chairs out from under them; and subjected them to other forms of physical and mental abuse. And there is no mystery why Turbiak did these things: she had, by her own account, *693 a “sick sense of humor” and liked “to target lower functioning students.” (Id. at 8136, 8143.)
The fact that none of these things happened to students without disabilities within the same school is all the evidence Gohl needs to survive summary judgment. A jury could look at the evidence and decide that because of Turbiak’s animus toward disabled students, she intentionally treated J.G. differently from other students at Webster Elementary School, or even within the school district. These non-disabled students are similarly situated by virtue of attending the same school as J.G. and other disabled students. And it is J.G.’s experience as a disabled student at that school that defines the class of comparators on which Gohl’s ADA and Rehabilitation Act claim rests. In other words, what defines the class of comparators is the disability status, or lack thereof, of students within the same school; this is contrary to the majority’s strained argument that there is no basis for comparing disabled and non-disabled students unless they all simultaneously occupy the same classroom.[1]
The majority claims that there is another explanation for Turbiak’s actions— namely, that she was “stressed out because of the level of disability of her students and the reduction of support.” (R. 184-9 at 6213.) Whether that explains or excuses Turbiak’s abuse of her students is something for the jury to decide, and not the district court in deciding a motion for summary judgment. Turbiak is free to argue her explanation to the jury, and the jury is free to accept or reject it.
The majority attempts to rely on Turb-iak’s twelve-year record as a special education teacher to call into question how someone who “chose to become a special education teacher in order to help disabled kids,” and who “stood by this objective for over a decade” could actually do the things she is accused of doing. Maj. Opn. at 684. As the majority sees it, “[tjhat’s a lot of supposing. And that’s quite a conclusion.” Id. To follow the majority’s tortured logic, anyone who has ever been in a position of trust or access for a long time gets an automatic presumption in their favor. That makes absolutely no sense. No one would suggest, for example, that there would be “a lot of supposing” to think that someone married for twelve years could actually beat his wife, or that a priest of twelve years could actually molest one of his parishioners. There is no mystery about what the majority is doing here: it is “supposing” that Turbiak did not do what she is accused of doing, all because of how long she has been teaching. But that sort of supposing is exactly what courts should not do in the context of summary judgment, where we examine the evidence in the light most favorable to the non-moving party and draw all inferences in that party’s favor.
The majority’s conjecture is completely belied by the record in this case. The *694 bottom line is that Gohl has presented more than enough evidence for a jury to reasonably find that J.G. was excluded from participation in, denied the benefits of, or subjected to discrimination under his school district’s educational program because of his disability. Gohl has established her prima facie case of discrimination, and since Defendants never offered a legitimate explanation for their actions, summary judgment should never have been granted.

B. Gohl’s § 1983 Substantive Due. Process Claim Against Turbiak

The district court again erred when it dismissed Gohl’s claim against Turbiak for violating J.G.’s Fourteenth Amendment right to substantive due process, in violation of 42 U.S.C. § 1983. As the majority indicates, Gohl’s § 1983 claim is premised on the theory that Turbiak’s grabbing J.G. by the head, violently jerking it back, and yelling in his face violated his due process right to be free from excessive force at the hands of his special education teacher. See Webb v. McCullough, 828 F.2d 1151, 1158 (6th Cir. 1987) (public school students have the right “to be free of state intrusions into realms of personal privacy and bodily security”) (quoting Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980)).
The majority accepts the district court’s opinion that Turbiak’s conduct did not rise to the conscience-shocking level required for a substantive due process claim. This Court recently explained that in order to raise a material issue of fact as to whether a teacher, such as Turbiak, violates a student’s right to be free from physical abuse, a plaintiff “must identify conduct that is so brutal, demeaning, and harmful as literally to shock the conscience.” Domingo v. Kowalski, 810 F.3d 403, 410-11 (6th Cir. 2016) (internal quotation marks and citations omitted).
Much like this case, Domingo involved a special education teacher named Kowalski who was accused of abuse after gagging a student with a bandana, strapping another to a toilet, and forcing another to sit with her pants down on a training toilet in front of all her classmates. Id. at 406.[2] In assessing the plaintiffs Fourteenth Amendment claim, this Court adopted the Third Circuit’s test for determining whether conduct shocks the conscience in violation of due process. Id. at 411. That test asks whether (1) there was a “pedagogical justification for the use of force,” (2) the force utilized was excessive to meet a “legitimate objective,” (3) the force was applied in a “good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm,” and (4) there was a “serious injury.” Id. (citing Gottlieb v. Laurel Highlands Sch. Dist., 272 F.3d 168, 173 (3d Cir. 2001)).
The majority, like the district court below, fails to appreciate that what Turbiak *695 did to J.G. — grabbing him by the head, jerking it back, and yelling in his face— must be considered against the backdrop of J.G.’s individual characteristics and severe disabilities. J.G. was three years old and suffered from hydrocephalus, a condition blocking the flow of fluid around his brain, causing it to accumulate in his skull. As a result of having this condition, J.G. is described as being “medically fragile,” to the point where any severe head movement could be life threatening to him. (R. 177-7 at 3977.) As his teacher — the person Gohl trusted to care for her severely disabled three-yeár-old son for several hours a day — Turbiak knew how fragile J.G. was, and how easily something could go wrong. Yet despite that, Turbiak grabbed and violently jerked J.G.’s head — the place where he was most vulnerable. And this was done supposedly because Turbiak saw him throw a toy. All of this background and history must be considered in determining the viability of Gohl’s excessive force claim against Turbiak; and when it is, there certainly is a genuine issue of material fact as to the objective reasonableness of Turb-iak’s actions.
At the same time, none of the Domingo factors preclude this case from going to a jury. With respect to the first factor— pedagogical justification — this Court explained that the question is “whether the teacher’s allegedly unconstitutional conduct is properly construed as an attempt to serve pedagogical objectives.” Domingo, 810 F.3d at 411 (internal quotation marks and citation omitted) (emphasis in original). In other words, there might be no constitutional violation where the teacher’s conduct, even if improper, is “capable of being construed as having a disciplinary or educational purpose.” Id. at 412 (citation omitted). Such was the case in Domingo, where even though Kowalski’s strapping one of her female students to a toilet with a belt was “inappropriate” and “misguided,” her “undisputed motivation was to assist [the disabled student] .... to relax and properly use the toilet, and not to humiliate or punish her.” Id. at 412-13.
Unlike Domingo, it is not undisputed in this case that Turbiak had a purely pedagogical motivation for what she did to J.G. Although the majority argues that Turbiak was motivated by a pedagogical interest— namely, correcting J.G.’s 'misbehavior in throwing a ring-stacking toy — a jury could find otherwise. A jury, for example, might well reject the notion that forcefully grabbing a brain-injured child by the head is related to teaching that child not to throw a toy. That same jury might look at all the evidence in the record — that Turbiak treated her disabled students “like animals,” (R. 206-2 at 8144), or that she had, as she put it, “a sick sense of humor,” {Id. at 8136), or that she once told her coworkers that “[fit’s a good thing I do nice things for the parents, that way they don’t hate me when I smack their kid around,” {Id. at 8145, 8136) — and find that under the circumstances, Turbiak’s behavior is not capable of being construed as having a disciplinary or educational purpose. This alone makes summary judgment inappropriate. To quote from Judge Boggs’ dissent in Domingo, Turbiak’s grabbing J.G. by the head, aggressively jerking it back, and yelling in his face “could be found by a reasonable jury to shock the conscience. At this stage we are not empowered to decide either that the action was or was not shocking on these facts, but merely whether there is a genuine issue.” 810 F.3d at 417 (Boggs, J., dissenting in part).[3]
*696 As to the second factor — excessiveness — even the majority acknowledges that a reasonable jury could find that Turbiak used more force than necessary. Again, the analysis here must take into account that Turbiak knew “[J.G.’s] head area was very fragile” (R. 179-9 at 4449); and a reasonable jury certainly could conclude that the force used on J.G. was excessive in light of what Turbiak knew about the three-year-old’s medical condition.
Under the third Domingo factor, this Court must consider whether the force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. 810 F.3d at 411. This factor is closely tied to the first factor — whether there was a “pedagogical justification” for the use of force. Id. And, as already explained, a reasonable jury, looking at all of the facts in this case, could conclude that if Turbiak’s behavior is not capable of being construed as having a disciplinary or educational purpose, that it was done for malicious or sadistic reasons. As Judge Boggs has put it, “if there were no legitimate pedagogical necessity for this action, then the significant degree of force employed could be taken by a reasonable jury to be malicious or sadistic.” Id. at 417 (Boggs, J., dissenting in part).
The fourth factor — whether a “serious injury” occurred — presents a closer question. See id. at 411. As the majority correctly points out,' “[t]here was not” a serious injury and Gohl does not argue otherwise. Maj. Opn. at 679. Nevertheless, this circuit has not “rigidly treated the existence of a serious injury as a mandatory requirement, but rather as evidence that force was excessive.” 810 F.3d at 418 (Boggs, J., dissenting in part). See, e.g., Webb, 828 F.2d at 1158-59 (denying qualified immunity even though the victim had no evidence of a serious physical injury because a jury could have found “that the alleged blows were a brutal and inhumane abuse of [the school principal’s] official power, literally shocking to the conscience.”); McDowell v. Rogers, 863 F.2d 1302, 1307 (6th Cir. 1988) (denying qualified immunity even though the victim “may not have suffered a ‘serious or permanent injury’ as a result of the alleged blows ... [since] there was clearly no need for them.”).
The same reasoning applies here. Because Turbiak was in a position of trust over J.G., and because it is possible that her actions were not disciplinary or educational in nature, a jury could find that under the circumstances, Turbiak’s need to grab J.G. by the head “was so minimal or non-existent that” what she did was “a brutal and inhumane abuse of [her] official power, literally shocking to the conscience.” Webb, 828 F.2d at 1159.
Moreover, the “serious injury” factor does not fully account for the fact that non-verbal, severely disabled children like J.G. may not be able to fully articulate the impact of abuse: “The fact that a child may have difficulty in expressing emotional disturbance from such treatment would counsel in favor of greater latitude, not less, in consideration of that factor. Otherwise the result is lessened protections, rather than heightened protections for disabled pupils as referenced in numerous decisions.” Domingo, 810 F.3d at 418 (Boggs, J., dissenting in part) (internal quotation marks and citation omitted). In any event, Gohl *697 need not satisfy each factor of the Domingo test — or even a majority of the factors — to defeat a summary judgment motion. At the very least, there is a question of fact as to whether Turbiak had a pedagogical motivation for what she did to J.G., and also as to whether the force used on J.G. was excessive, and that should be enough to get her to a jury. The district court should not have granted summary judgment with respect to Gohl’s substantive due process claim, and the majority is wrong to conclude otherwise.

C. Gohl’s Equal Protection Clause Claim

As already discussed, the district court erred when it ignored all the evidence suggesting that J.G. was subjected to discrimination because of his disability. The district court compounded its error by incorrectly dismissing Gohl’s Fourteenth Amendment Equal Protection Clause claim for the same reason, ie., by summarily concluding that Gohl cannot show any evidence of discrimination, an essential part of her claim. The majority now makes the same mistake.
Gohl alleges that J.G. was deprived of an equal education opportunity as a result of disability-based harassment of which Defendants were aware, in violation of the Equal Protection Clause of the Fourteenth Amendment. The Fourteenth Amendment provides that no state shall “deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV, § 1. The Equal Protection Clause prevents states from making distinctions that “(1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis.” Johnson v. Bredesen, 624 F.3d 742, 746 (6th Cir. 2010) (citing Radvansky v. City of Olmsted Falls, 395 F.3d 291, 312 (6th Cir. 2005)).
Gohl argued in the district court, as she does here, that J.G. was harassed because of his disability. The district court granted summary judgment on the ground that Gohl did not raise a genuine issue of material fact that J.G. was treated differently than similarly situated students. The problem is that the district court’s ruling on Gohl’s ADA and Rehabilitation Act claims, based on the district court’s contention that Gohl failed to show that the school district treated similarly situated, non-disabled students better than it treated J.G., essentially foreclosed Gohl’s equal protection claim.
The district court’s analysis went no further. Because it found that Gohl did'not provide any evidence as to how similarly situated, non-disabled students were treated, the court ended the analysis there. See also Maj. Opn. at 684 (“Gohl’s equal protection claims thus fail for the same reasons that her Americans with Disabilities Act and Rehabilitation Act claims do.”). This analysis, and the majority’s affirmation of it, completely misses the mark.
Gohl points to a number of incidents in which disabled students were subjected to various forms of abuse — being force-fed, screamed at, pushed, humiliated, and the list goes on. Gohl claims that these things happened to students with disabilities, but not to the other students at Webster Elementary School. If true, this fact alone is all the evidence she needs to create an inference of disparate treatment. Certainly, it is undisputed by the record that disabled students at the school, including J.G., were being treated less favorably than nondisabled students; the disparate treatment to which the disabled students were subjected constituted significant and damaging physical and emotional abuse. And since the district court erred in finding as a matter of law that Gohl could not get past the similarly situated analysis, *698 this case needs to be remanded for further consideration of Gohl’s Equal Protection Clause claim.

D. Gohl’s Municipal Liability Claim

Gohl also asserted a municipal liability-claim under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The district court did not reach this issue because it found that no constitutional violations had occurred: See also Maj. Opn. at 685 (“No one is liable for a constitutional violation that never occurred.”). Though it is true that there can be no Monell municipal liability under § 1983 unless there is an underlying unconstitutional act, see Wilson v. Morgan, 477 F.3d 326, 340 (6th Cir. 2007), this is not that case. Gohl has presented enough evidence to create a genuine issue of material fact on each of her claims. Because the district court erroneously failed to reach the merits of Gohl’s Monell claim, a remand is necessary for the court in the first instance to make the necessary findings.
IV.
By fundamentally misapplying well-settled summary judgment standards, ignoring some of the most important facts, and disregarding evidence favorable to Gohl, the majority reveals how result-oriented it is in attempting to reach its own conclusions. The majority’s approach to this case sidesteps the Supreme Court’s clear direction that when reviewing a summary judgment decision, an appellate court must examine the evidence in the light most favorable to the nonmoving party and draw all inferences in that party’s favor. This basic and fundamental principle of civil procedure seems lost on the majority in this case.
All that matters here is that Gohl has presented enough evidence to create a genuine issue of material fact on each of her claims, and as a result, her case should go to a jury. For these reasons, this case should be reversed and remanded. I respectfully dissent.

. The majority accuses the dissent of ''reallocating] the burden of proof” and relying on “evidence that even Gohl admits she doesn't have.” Maj. Opn. at 685. Reallocating the burden of proof and relying on evidence that does not exist would be improper. However, what this Court is supposed to do is review the entire record and draw all reasonable inferences in Gohl’s favor. The majority utterly fails to do that. Instead, the majority seems to be suggesting that Gohl prove a negative by adducing evidence that what happened to disabled students did not happen to students without disabilities. But the record clearly shows that in all the time Turbiak was abusing her disabled students, the school district received no complaints about any abuse being committed against students without disabilities; and the majority cannot seriously dispute that. Despite what the majority says, to get past summary judgment, Gohl need not adduce evidence about allegations for which there is no factual support.

. The majority frames Domingo as one involving a teacher’s use of the redirecting technique — the same technique that Turbiak claimed she used on J.G. See Maj. Opn. at 678-80; see also R. 179-6 at 4353 (deposition testimony explaining that Turbiak denied grabbing J.G. by the head or yelling in his face, and instead said she was using a technique called "redirecting,” in order to "keep [J.G.’s] head ... from bouncing around” after she saw him throw a toy.). The majority’s description of the facts in Domingo is misleading to the extent it implies that the teacher in that case was using the redirecting tech-ñique on one of her students. The majority appears to be offering its own version of the facts; nowhere in Domingo is there any mention of the redirecting technique.
Furthermore, the majority attempts to use its discussion of the redirecting technique to bolster its argument even though there is no evidence in the record below that would suggest that there is an empirical basis justifying the use of the technique as a legitimate educational tool, or that the technique is widely accepted in the child development community-

. The majority surprisingly claims that the dissent overlooks "Judge Boggs’s agreement with the majority” in Domingo that "the use of redirection did not shock the conscience in that case.” Maj. Opn. at 685. This is a complete mischaracterization of Domingo. That case did not establish a "redirecting legal *696 doctrine,” which would exonerate a teacher from using a supposed pedagogical tool. The majority is simply pretending that Turbiak used an approved technique on J.G. and that Turbiak’s behavior thus does not shock the conscience. However, these are questions of fact which are not suitable for.disposition on summary judgment.